# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| CAPITAL ONE TELEPHONE | ) | Master Docket No. 1:12-cv-10064 |
| CONSUMER PROTECTION ACT | ) | MDL No. 2416 |
| LITIGATION | ) | |
| _____ | ) | |
| | ) | |
| This document relates to: | ) | Case No: 1:12-cv-10135 |
| BRIDGETT AMADECK, et al., | ) | |
| v. | ) | |
| CAPITAL ONE FINANCIAL | ) | |
| CORPORATION, and CAPITAL ONE | ) | |
| BANK (USA), N.A. | ) | |
| _____ | ) | |
| | ) | |
| This document relates to: | ) | Case No: 1:11-cv-05886 |
| NICHOLAS MARTIN, et al., | ) | |
| v. | ) | |
| LEADING EDGE RECOVERY | ) | |
| SOLUTIONS, LLC, and CAPITAL ONE | ) | |
| BANK (USA), N.A. | ) | |
| _____ | ) | |
| | ) | |
| This document relates to: | ) | Case No: 1:12-cv-01061 |
| CHARLES C. PATTERSON, | ) | |
| v. | ) | |
| CAPITAL MANAGEMENT | ) | |
| SERVICES, L.P. and CAPITAL ONE | ) | |
| BANK (USA), N.A. | ) | |
| _____ | ) | |

**OBJECTIONS OF VANESSA FV VANWIEREN TO PROPOSED SETTLEMENT**

**AND NOTICE OF INTENT TO APPEAR**

**I.    INTRODUCTION**

Vanessa FV VanWieren ("Objector") objects to the Proposed Class Action. Objector is a Class Member qualified to make a claim. Objector resides in Cardiff-by-the-Sea, California. Her Notice ID is 84830-21517-07457.

Capital One will pay $75,455,098.74 into a common settlement fund to settle claims related to violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. Violations of the TCPA carry statutory damages of $500 per call, or $1,500 per willful violation, but the class benefit here is likely to be in the $50 range. Despite this poor result, class counsel are asking the court to award them attorneys' fees of $22,636,528, or 30% of the settlement of the common fund. This settlement achieves little in the way of prospective practice changes and provides minimal compensation to class members. Class counsel have not earned fees of 30% of this megafund settlement.

**A. Legal Standard**

In reviewing a proposed settlement, the district court has a duty to ensure the settlement is "fair, reasonable, and adequate." Fed. R. Civ. Proc. 23(e)(2) Appellate courts accord considerable deference to the district court's "knowledge of the litigants and of the strengths and weaknesses of their contentions". . . . and recognize that the district court "is in the best position to evaluate whether the settlement constitutes a reasonable compromise." *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and Class Members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfashi v. Fleet Mortgage Corp.* 356 F.3d 781, 785 (7th Cir. 2004).

The court must be protective of unnamed class members. "In approving a

proposed class action settlement, the district court has a fiduciary responsibility to ensure that 'the settlement is fair and not a product of collusion, and that the Class Members' interests were represented adequately.'" *Grant, citing In re Warner Communications Sec. Litig*., 798 F.2d 35, 37 (2d Cir.1986). *See also Silber v. Mahon*, 957 F.2d 697, 701 (9th Cir. 1992) ("Both the class representative and the courts have a duty to protect the interests of absent Class Members.")

Prior to formal class certification, there is greater potential for breaches of fiduciary duties owed to the class during settlement. Heightened scrutiny is required. See *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 681 (7th Cir. 1987) ("When class certification is deferred, a more careful scrutiny of the fairness of the settlement is required."). Courts may refuse to approve a settlement if insufficient notice is provided to Class Members to protect their due process rights. Fed. R. Civ. Proc. 23(e)(1) specifies that "direct notice" of a proposed settlement must be provided "in a reasonable manner to all Class Members who would be bound by the proposal."

## II. ARGUMENT

### A. The compensation offered to class member is uncertain and low

The TCPA permits claimants to recover statutory damages of $500 for each negligent violation and treble damages or up to $1,500 for each knowing or willful violation. 47 U.S.C. §227(b)(3). The allegations in the Complaint indicate that individual class members received multiple calls – even multiple calls each day –for several weeks, even after requesting a stop to the calls. Given such violations, potential damages are huge.

Plaintiff Amadeck, for example never consented to receive prerecorded calls from Capital One. But starting in October of 2009, Amadeck alleges Capital One contacted her on her cellular telephone using an artificial or prerecorded voice and/or an automatic telephone dialing system three or more times per day for six weeks or more. She claims

to have repeatedly called Capital One in an attempt to put a stop to the calls, but the calls continued unabated for weeks, even after she spoke to a Capital One supervisor. Doc. 120, Complaint, ¶ 34. In addition, these calls reduced her available minutes on her plan and therefore involved a cost. Complaint, ¶ 35.

Despite the large penalties provided for by the TCPA, Class Counsel estimate the settlement will provide individual class members between $20 and $40 – regardless of how many harassing phone calls the class member may have received. In both *Arthur v. Sallie Mae, Inc.*, 2012 WL 4075238 (W.D. Wash. Sept. 17, 2012) and *Rose v. Bank of America*, No. 11-cv-02390 (N.D. Cal. Aug. 29, 2014) (Doc. 108, Final Approval Order, attached hereto as Exhibit A), class counsel estimated class members would receive between $20 and $40. In part based on the low projected award, in *Rose* the court found the benefits to the class, and inflated lodestar information, supported a substantial reduction of the attorney's fee award to approximately 7% of the common fund. Based on current claims information, individual class member compensation is likely to be in the $50.00 range – lower than the result achieved in either *Sallie Mae* or *Rose*.

A review of other class action cases alleging violations of the TCPA indicate the class recovery achieved here is less than exceptional. In *Samantha Ellison v. Steve Madden Ltd.*, case number 2:11-cv-05935, Central District of California, every class member submitting a valid claim would be eligible to receive $150, unless the total claims were to exceed $10 million, in which case each class member would receive a smaller amount. Likewise in *Kramer v. Autobytel Inc.*, et al, Case Number 4:10-cv-02722, Northern District of California, Judge Claudia Wilken gave preliminary approval to a settlement under which class members would receive payments of up to $100 each. In *Grannan v. Alliant Law Grp., P.C.*, C10-02803 HRL, 2012 WL 216522 (N.D. Cal. Jan. 24, 2012), each class member received between $300 to $325. In *Malta v. Fed. Home Loan Mortg. Corp.*, 10-CV-1290-BEN (S.D. Cal.), after final approval, claimants received $84.82. In *Kramer v. B2Mobile*, 10-CV-2722-CW (N.D. Cal.), class counsel

3

estimated each claimant would be paid $100, subject to pro-rata reduction based on the maximum fund, and it was unclear from the final approval order how much money each claimant would actually receive.

### B. The Settlement will **not** lead to meaningful practice changes

The practice changes class counsel claim to have achieved for the class are also insubstantial. The Settlement Agreement claims "As a benefit to all Settlement Class Members, Capital One has developed and implemented significant enhancements to its calling systems designed to prevent the calling of a cellular telephone with an autodialer unless the recipient of the call has provided prior express consent." Settlement Agreement, Section 4.01, Doc. 131-1, page 12. However, other documents inform us that this "consent" is actually inferred by providing a cell phone number on an application for credit. *See* Declaration of Jonathan D. Selbin in Support of Class counsel's Motion for Attorneys' Fees and Service Awards, ¶ 27 (stating Capital One instituted a protocol under which it places calls to a cellular telephone number using its dialer(s) only where the cellular telephone number was provided on the customer's application for credit). This may technically comply with FCC regulations, but consumers will not always understand that by providing a cell phone number they are deemed to have provided consent. Because of this, the ability to request the calls cease is particularly important.

However, it remains unclear whether consumers will easily be able to make the calls stop. As noted above, Amadeck claims she repeatedly called Capital One in an attempt to put a stop to the calls, but the calls continued unabated for weeks, even after she spoke to a Capital One supervisor. Class counsel now claim "Capital One will also use reasonable commercial efforts to stop calling a cellular telephone number if the called party requests." Motion for Attorneys' Fees, Doc. 176, page 9. But "reasonable commercial efforts" is not defined. Other class action settlements have provided class members the option to revoke their consent by submitting a revocation request. For example, in *Bayat v. Bank of the West*, Case No. 13-cv-2376 (EMC) pending in the

United States District Court for the Northern District of California, Settlement Class Members may ask not to receive further automated telephone calls to their cell phones from Bank of the West or entities calling on its behalf by submitting a valid revocation request. *Notice*, Section 7, available at http://www.bayattcpasettlement.com/media/163450/v6_bwbe1_notice_073014_final.pdf.

 Although Class Counsel claim that "as a direct result of these lawsuits and the prospective practice changes secured by Class counsel in this Settlement, every Class member who wants the automated calls to stop has the ability to make the calls stop" (Doc. 176, page 9) they have not secured any promises as to how the defendants will go about scrubbing telephone numbers from their call lists. By contrast, in *Grannan*, the defendant agreed to a one-year injunction whereby defendant would "scrub" their automated dialing lists of cell phone numbers, and agreed not to call those numbers using an automated dialing system. In *Arthur v. Sallie Mae*, the defendants agreed not to make calls to the cell phones of class members who submitted forms revoking their consent with their claim forms. In *Kramer v. B2Mobile*, defendants agreed to a four-year injunction whereby they agreed to keep documented proof of prior express consent received from cell phone owners. As part of the injunction, defendants agreed that, prospectively, prior express consent would require an affirmative action by the customer such as clicking a box saying "I Accept." In addition, the claim forms in this settlement contained an option that class members could select to remove their cell phone number from defendants' calling lists.

 The injunctive relief achieved through this settlement does not seem to provide any real practice changes, and weighs against both approval and high attorneys' fees.

### C. The Notice may not have adequately notified many parties that they were class members

The Settlement Agreement states that "Released Parties" specifically includes all corporate affiliates of Capital One, Leading Edge, CMS, and AllianceOne, related to

5

Capital One's credit-card lines of business. This is an extremely broad release. The release includes additional language relating to á broad group of Capital One affiliates, including "past, present, and future parents, subsidiaries, affiliated companies and corporations, and each of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, joint ventures, assigns, or related entities, and each of their respective executors, successors, assigns, and legal representatives". Settlement Agreement, Section 2.36, Doc. 131-1, page 8. Most troubling, released parties also includes "all entities with which Capital One contracts to obtain representatives to place calls using Capital One's dialers." *Id.*

In addition, a cursory review of Capital One's website reveals that Capital One provides credit cards for several companies that do not appear to be identified anywhere in the settlement documents and may not have been included in the notice program. *See* [http://www.capitalone.com/credit-cards/partnerships/](http://www.capitalone.com/credit-cards/partnerships/), visited on October 27, 2014. This web page includes pictures of PlayStation and Sony credit cards, which do not appear to clearly indicate they are Capital One cards. The Class Notice does not adequately indicate all of the numerous other cards that might be included. At the very least the court needs to ensure that these account holders have been properly identified and have been sent individualized notice explaining that their "Sony" card or other card is included in the settlement.

The court should be aware that in other TCPA cases large groups of class members were not identified in discovery or provided notice of the settlement. *See, e.g., Arthur v. Sallie Mae, Inc.,* 2012 WL 4075238 (W.D. Wash. Sept. 17, 2012) (nearly two million class members were not identified in original notice plan) and *Connor v. Chase*, Case No: 10-cv-01284 DMS (BGS) (S.D. Cal. 2012) (where original notice plan to 1,381,406 class members failed to identify 1,653,559 class members and a second notice

6

plan was ordered). At the very least the court should inquire into the efforts made to ensure that class members have been adequately notified of all corporate entities being released through this settlement, and that class members whose claims stemmed from any undisclosed entities are provided adequate notice before their claims are released.

### D. Attorneys' Fees Requested are Too High and the Attorneys' Fee Motion does not provide Information Necessary to Review Class Counsel's Request

This case has settled after little motion practice, little discovery, and is eerily similar to multiple cases pursued by the same attorneys. Based on the record, the attorneys do not deserve 30% of the common fund in this case.

The court must be protective of the class in the fee setting stage. In common fund cases, courts have the equitable power to compensate attorneys from the recovery won for plaintiffs. *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 973 (7th Cir.1991). Because the payment of attorneys' fees comes from the common fund, after attorneys secure a settlement, their role regarding fees changes from one of fiduciary for their clients to that of claimants against the fund created for their clients' benefit. *Cook v. Niedert,* 142 F.3d 1004, 1011 (7th Cir.1998). "The court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications." *Id.* Basically, "the district court must ensure that plaintiffs pay no more than what is reasonable." *Id.* at 1012.

#### *1. Presence of a clear sailing agreement requires heightened scrutiny*

Under Section 5.01 of the Settlement Agreement, "Defendants will not object to any request by Class Counsel for attorneys' fees in an amount not exceeding 30% (thirty percent) of the Settlement Fund." This clear sailing agreement indicates that the request for attorneys' fees should be "subjected to intense critical scrutiny by the district court." See *Redman v. Radioshack Corp.*, No. 14-1470, 2014 2014 WL 465447, -- F.3d -- at *13 (7th Cir. Sept. 19, 2014). The court reasoned:

> …the defendant won't agree to a clear-sailing clause without compensation—namely a reduction in the part of the settlement that goes

7

>to the class members, as that is the only reduction class counsel are likely to consider. The existence of such clauses thus illustrates the danger of collusion in class actions between class counsel and the defendant, to the detriment of the class members.

*Id.* The heightened scrutiny required under *Redman* cannot be accomplished because class counsel have not provided sufficient information. In *In re Bluetooth Headset Prod. Liab. Litig*, 654 F 3d 935 (9th Cir. 2011) also found a clear-sailing agreement an indication that the Settlement may be unfair to the class, warranting heightened scrutiny. *See also* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 TUL. L. REV. 813, 816 (2003) (urging courts to "adopt a per se rule that rejects all settlements that include clear sailing provisions").

### *2. The Seventh Circuit requires analysis of reasonable attorneys' fees from the perspective of the market*

In the Seventh Circuit, courts in common fund cases may choose either the lodestar or percentage method of calculating fees. *Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 566 (7th Cir.1994). There are advantages and disadvantages to both approaches. The chief advantage of the percentage approach is simplicity of administration. *See, e.g., Florin,* 34 F.3d at 566; *In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 572–73 (7th Cir.1992). The chief advantage of the lodestar approach is accountability. *See, e.g., Harmon,* 945 F.2d at 974; *Cook,* 142 F.3d at 1013 (citing *Harmon*). Ultimately, in the Seventh Circuit, the most important consideration is the market. The Seventh Circuit is less concerned with the choice between the lodestar or percentage method than with approaching the determination through the lens of the market. Ideally, the analysis should reflect what an arms-length negotiation between the class and the lawyers at the beginning of the case would have likely produced. *In re Synthroid Marketing Litig.,* 264 F.3d 712, 718–19 (7th Cir. 2001) ("Timing is more important than the choice ... between percentage and hourly rates, for [both] of these systems have their shortcomings.").

The Seventh Circuit has expressed the hope that courts will attempt to set reasonable fees at the outset. In class action litigation, however, the fees are awarded by the district court. Class Counsel attempt to suggest the fees were decided in advance by pointing out that the class representatives entered into fee agreements providing for attorneys' fees ranging from one-third to 40% of the total settlement value. See Doc. 176, page 15. Class Counsel's retainer agreement with representative plaintiffs cannot be considered dispositive here. Class representatives have no incentive to economize on fee requests, as the money will not be coming out of their pockets. Indeed, such agreements cast doubt on the adequacy of the class representatives to protect the interests of class members given the fact that they will be receiving incentive awards of one hundred times the compensation provided to absent class members. These fee agreements cannot serve as a substitute for the court's determination of appropriate fees.

As in most class action litigation, the district court here did not determine the fees in advance. "The reality, of course, is that fees often are not determined *ex ante*. But because we always seek to replicate the market value of an attorney's services—and because the market would assign value up front—a district court that leaves the matter of fees until the end of the litigation process 'must set a fee by approximating the terms that would have been agreed to *ex ante,* had negotiations occurred.'" *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014), *citing Synthroid*, at 719.

### a) *Requested fee does not reflect the market price for legal services*

The "market" for legal services is always changing. Of late, clients –even large institutional clients with deep pockets – have become increasingly demanding, unwilling to pay without careful scrutiny of billing records and other detailed information substantiating the services performed. Despite the increasing competition in the legal marketplace, class counsel claim the market supports ta fee request of 30% of the

9

common fund. They are mistaken: the market does not support such a request.

### b) *A larger settlement may not deserve a proportionally larger fee award*

First, although fee awards of 30% may be within the range of acceptable attorneys' fees in the Seventh Circuit, 30% is high for such a large settlement. In practice – based on market principles – attorney fee percentage awards in large class actions show an inverse relationship to the size of the award. See Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811 (2010). ). For settlements over $72.5 million, the mean percentage award nationwide is only 18.4%, much less than the fee percentage sought by Class Counsel in this case. Id. at page 839. In *Synthroid* the 7th Circuit rejected a district court's arbitrary decision that attorney fee awards in megafund cases should not exceed 10%. While the court rejected the district court's arbitrary limit on attorneys' fees, the court also commented approvingly on fee awards based on declining marginal percentages.

> Both negotiations and auctions often produce diminishing marginal fees when the recovery will not necessarily increase in proportion to the number of hours devoted to the case. In *Oracle Securities Litigation*, 132 F.R.D. 538 (N.D.Cal.1990), the judge selected a bid with a declining contingent-fee scale, plus an early-settlement discount. 132 F.R.D. at 541, 548. The schedule provided for 30% of the first million, 25% of the next $4 million, then 20% of the next $10 million, and 15% of everything above $15 million. Following settlement, counsel received a total of $4.8 million, or 19.2% of the $25 million recovery.

*Synthroid*, at 721, citing *In re Oracle Securities Litigation,* 852 F. Supp. 1437, 1457 (N.D.Cal.1994). The court's approval of this approach implicitly acknowledged that larger settlements do not always require proportionally higher quality legal work or greater quantities of work, and may not merit such a large percentage fee as would be appropriate in smaller cases.

### c) *Comparison to other TCPA cases does not support such a large fee award*

10

Contrary to Class Counsel's argument, comparable TCPA settlements do not support the fees requested here. A recent decision in the Northern District of California suggests Class Counsel's fee request is far out of line with the current market for these cases.

In *Rose v. Bank of America*, *supra* (Exhibit A) the district court conducted its own review of comparable TCPA settlements. The Court noted that in *Grannan v. Alliant Law Grp., P.C.,* C10-02803 HRL, 2012 WL 216522 (N.D. Cal. Jan. 24, 2012), the court granted a fee request for 25% of the Settlement Fund, which reflected a multiplier of 1.47. In *Adams v. AllianceOne, Inc.*, 08-CV-248-JAH (S.D. Cal. Sept. 28, 2012), the court approved attorneys' fees of 30% of the Settlement Fund, with a multiplier of 3.81. Finally, in *Arthur v. Sallie Mae, Inc*., 10-CV-198-JLR (W.D. Wash.), a granted request for 20% of the Settlement Fund reflected a multiplier of 2.59. Importantly, although these courts' fee awards were based on a percentage of the common fund, each court conducted a lodestar cross check as part of its analysis.

The result in *Rose* casts suspicion on Class Counsel's fee request. In *Rose*, the court reduced the fees from the requested $8,020,976.00 (including expenses) to $2,402,243.91 – representing approximately 7 % of the settlement fund. The settlement fund was increased by approximately five and a half million dollars. The decision to reduce the fee award was based in part on a finding that the lodestar information was inflated. The court reduced the lodestar requested in two phases, mediation and settlement, and case investigation. The court also found class counsel's strategy of filing multiple duplicative and presumably coordinated lawsuits may have intimidated the Defendant, but could not support the requested fees. This aspect of the *Rose* decision is particularly relevant here, as class counsel have essentially acknowledged that they collaborated in pursuing the multiple cases eventually consolidated in this case. The Motion for Attorneys' Fees states "Plaintiffs' counsel in the class actions described above worked collaboratively to prosecute these actions in the most efficient—and more

11

importantly, the most effective—manner possible." Doc. 176, citing Selbin Decl, ¶ 19.

In *Rose*, the court also found far too many attorneys participated in the settlement negotiations and accordingly reduced the requested fees for that portion. The court should pay particular attention to that decision, which reflected a careful analysis of information submitted by class Counsel, including detailed reports substantiating counsel's lodestar. A recent Seventh Circuit decisions affirms the continuing relevance of lodestar information in the class action context. See *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 245 (7th Cir. 2014). In *Americana Art*, the court applied the lodestar method based on a determination that a 30% fee award was not warranted. Use of the lodestar method led the court to reduce the attorneys' fees from the requested $2 million, to $1,147,698.70, which included applying a risk multiplier of 1.5 to the lodestar.

Although fee awards vary greatly in TCPA cases, the most relevant comparisons are provided by *Rose* and *Sallie Mae*. The concerns raised by the Settlements in those cases, in particular regarding sufficiency of notice in *Sallie Mae*, and the duplicative legal work in *Rose*, suggest additional scrutiny is necessary here, and argue against the court merely rubber stamping its approval.

### 3. *The time spent by class counsel continues to be a key part of the analysis of a reasonable fee*

Remarkably, class counsel have failed to provide any lodestar information in support of their request for attorneys' fees. Analysis of the time spent on the litigation is an essential factor in determining a reasonable percentage award, particularly when indicia of self-dealing exist and when the stage of the litigation proceedings indicate such an easy, early settlement. In *Synthroid* the court noted, "The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, **in part on the amount of work necessary to resolve the litigation**, and in part on the stakes of the case." *Synthroid*, at 721. *Synthroid* and later cases continue

12

to underscore the importance of the lodestar cross check. In *Synthroid*, the court explicitly stated it was not overruling earlier cases in focusing on adopting a market-based approach, but was merely clarifying its earlier holdings. The Seventh Circuit's earlier holdings outlined the value of lodestar analysis. *See e.g. Skelton v. Gen. Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) and *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 973-75 (7th Cir. 1991).

Recent case law also supports the ongoing importance of conducting a lodestar cross check. *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 909 (S.D. Ill. 2012), determined that lodestar analysis confirmed the reasonableness of a one-third percentage award. The lodestar supported the fee award because "Class Counsel dedicated thousands of attorney hours and millions of dollars over eight years to pursue this action with no guarantee of ever recovering their investment." *Id.*

Although all too frequently courts rubber stamp lodestar information provided by Class Counsel, *Rose, supra*, shows that careful analysis of lodestar information submitted may well reveal inefficiencies and duplicative work that a paying client would not stand for. The lodestar information provided by Class Counsel was crucial to the court's analysis of the work performed. This case is more than just a relevant comparison, however. The same attorneys litigating Rose are represented – on both sides. These attorneys have an established practice of filing class actions settled within a relatively short time, and accompanies by large fee requests. The legal issues are the same as those found in *Rose* and *Sallie Mae*. More to the point, the district court's reliance on class counsel's lodestar in *Rose*, coming only a few days before class counsel filed their fee motion here, may have influenced the decision to not provide the district court with information on their lodestar. We feel certain that analysis of class counsel's hours will reveal that the fees requested here would be based on a double digit lodestar multiplier. To approve fees that no willing client would support – based on largely duplicative work – would be an abuse of discretion by this court.

13

### *4.* Class Counsel's fee request should be rejected

District courts are afforded wide discretion in analyzing attorney fee petitions. However, Class Counsel seek to mislead the court into approving this settlement without properly analyzing the basis for the fee request. Analysis of the percentage fee award requires analysis of the time spent on the litigation. Class Counsel did not provide the court sufficient information to do this analysis. Neither this Circuit nor the competitive market for attorneys' fees, supports this court awarding fees of 30% of the common fund without receiving sufficient information to determine whether counsel have earned this fee. None of the factors cited by Class Counsel support the requested attorney fee award: The risk of nonpayment does not support the requested fee, nor does the quality of class counsel's performance – which is highly suspect based on the numerous ways they have short changed the class. A substantial reduction of the fees is required.

### E. Notice and Settlement Administration Expenses are not a Class Benefit

The Seventh Circuit's ruling in *Redman, supra,* 2014 WL 4654477 established that notice and settlement administration expenses should not be included in calculating attorneys' fees. As explained in *Redman*:

> But the roughly $2.2 million in administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.

*Id.* at *5. Justice Posner pointed out that including settlement administration and notice costs in the fee award calculation creates a "perverse incentive; for higher administrative expenses make class counsel's proposed fee appear smaller in relation to the total settlement than if those costs were lower." *Id.* This eliminates any incentive class counsel might have to economize on expenses.

Class counsel seek to mislead the court by suggesting that *Redman* does not apply to this case because *Redman* was a CAFA case. Although *Redman* did concern CAFA,

the court explained that the case was "centrally about class action procedure" and much of the discussion did not concern CAFA. *Id.* at *2. A careful reading of *Redman* indicates that the $4,628,700 spent on notice and claims administration as of September 26, 2014 in this case must be excluded in determining the attorneys' fee award. Any other result would essentially result in class counsel receiving a $1,388,610 commission on the notice and claims administration expenses. This would be unfair to the class.

### III. JOINDER IN OTHER OBJECTIONS

These objectors join in and adopt all other well-founded and meritorious objection.

### IV. CONCLUSIONS

Based on the foregoing, and any other arguments to be presented at oral argument, these objectors request that the court sustain their objections and grant the following relief:

- Upon proper hearing, sustain these Objections.
- Defer final approval pending discovery related to the adequacy of notice to all released parties.
- Upon proper hearing, enter such Orders as are necessary and just to alleviate the inherent unfairness, inadequacies and unreasonableness of the Settlement.

Dated: October 27, 2014

By: /s/ Joseph Darrell Palmer
Joseph Darrell Palmer
Law Offices of Darrell Palmer PC
2244 Faraday Avenue, Suite 121
Carlsbad, CA 92008
Phone: 858-215-4064
Fax: 866-583-8115
Email: Darrell.palmer@palmerlegalteam.com

Attorney for Objector Vanessa FV VanWieren

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2014, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the Northern District of Illinois by using the USDC CM/ECF system.

I certify that all participants in the case who are registered CM/ECF users that service will be accomplished by the USDC CM/ECF system.

/s/ Joseph Darrell Palmer
Joseph Darrell Palmer
Attorney for Objector