**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE | ) | |
| CAPITAL ONE TELEPHONE | ) | Master Docket No. 1:12-cv-10064 |
| CONSUMER PROTECTION ACT | ) | MDL No. 2416 |
| LITIGATION | ) | |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| BRIDGETT AMADECK, et al., | ) | Case No: 1:12-cv-10135 |
| | ) | |
| v. | ) | |
| | ) | |
| CAPITAL ONE FINANCIAL | ) | |
| CORPORATION, and CAPITAL ONE | ) | |
| BANK (USA), N.A. | ) | |
| This document relates to: | ) | |
| | ) | |
| NICHOLAS MARTIN, et al., | ) | Case No: 1:11-cv-05886 |
| | ) | |
| v. | ) | |
| | ) | |
| LEADING EDGE RECOVERY | ) | |
| SOLUTIONS, LLC, and CAPITAL ONE | ) | |
| BANK (USA), N.A. | ) | |
| This document relates to: | ) | |
| | ) | |
| CHARLES C. PATTERSON, | ) | Case No: 1:12-cv-01061 |
| | ) | |
| v. | ) | |
| | ) | |
| CAPITAL MANAGEMENT | ) | |
| SERVICES, L.P. and CAPITAL ONE | ) | |
| BANK (USA), N.A. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.    STATEMENT OF THE FACTS ................................................................... 2

     A.    The TCPA Claims ................................................................................. 2

     B.    Plaintiffs Thoroughly Litigated the TCPA Claims Efficiently Through Complex MDL Litigation ..................................................... 3

         1.    The Class Actions ................................................................... 3

         1.    The Multi-District Litigation .................................................. 4

         2.    The Parties' Mediations ......................................................... 4

         3.    Confirmatory Discovery ......................................................... 5

     C.    The Proposed Settlement ...................................................................... 5

         1.    The Settlement Class ............................................................... 6

         2.    Injunctive Relief for All Settlement Class Members .............. 6

         3.    Monetary Relief for Settlement Class Members ..................... 7

         4.    Class Release ........................................................................... 8

         5.    Attorneys' Fees and Class Representative Service Awards .......... 8

III.   CLASS NOTICE HAS BEEN DISSEMINATED ....................................... 9

     A.    Direct Mail and Email Notice .............................................................. 9

     B.    Internet Notice .................................................................................... 10

     C.    Settlement Website and Toll-Free Number ....................................... 10

     D.    CAFA Notice ...................................................................................... 11

IV.   THE CLAIMS ADMINISTRATION PROGRAM UTILIZED BEST PRACTICES ............................................................................................... 11

     A.    Claims Administration ....................................................................... 11

     B.    Settlement Administration Costs ....................................................... 11

V.    FINAL APPROVAL IS WARRANTED .................................................... 12

     A.    The Settlement Approval Process ...................................................... 12

     B.    The Settlement is Fair, Reasonable, and Adequate, and Should be Approved ............................................................................................. 13

         1.    The Strength of the Plaintiffs' Case Compared to the Terms of the Proposed Settlement Supports Final Approval ................. 14

- i -

**TABLE OF CONTENTS**
(continued)

**Page**

a.     The Monetary Amount And Injunctive Relief
Offered in Settlement Supports Final Approval .............. 14

b.     The Strength of Plaintiffs' Case Supports Final
Approval ........................................................................ 15

2.     Continued Litigation is Likely to be Complex, Lengthy,
and Expensive, and Thus This Factor Favors Final
Approval ................................................................................. 19

3.     Class Member Response Has Been Overwhelmingly
Positive to the Settlement, Supporting Final Approval .............. 19

4.     Class Counsel Strongly Endorse the Settlement......................... 20

5.     The Stage of the Proceedings and the Amount of Discovery
Completed Supports Final Approval ........................................... 20

VI.     CONCLUSION.................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aliano v. Joe Caputo & Sons - Algonquin, Inc.,*
No. 09 C 910, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ................................... 18

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee,*
616 F.2d 305 (7th Cir. 1980), overruled on other grounds by
*Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998)...................................................... 12, 13, 14

*Arthur v. Sallie Mae, Inc.,*
No. 10-cv-132413, 2012 U.S. Dist. LEXIS 132413 (W.D. Wash. Sept. 17, 2012) ............... 16

*Chapman v. First Index, Inc.,*
No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556 (N.D. Ill. March 4, 2014) ............................ 17

*Elkins v. Medco Health Solutions, Inc.,*
Case No. 4:12CV2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014) ................ 16

*G.M. Sign, Inc. v. Brinks Manufacturing Company,*
No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084 (N.D. Ill. March 4, 2014) ............................. 17

*Greene v. DirecTV, Inc.,*
Case No. 10-C-117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) ...................... 16

*Higginbotham v. Hollins,*
No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) ........................... 16

*In re AT&T Mobility Wireless Data Servs. Sales Litig.,*
270 F.R.D. 330 (N.D. Ill. 2010)............................................................................................. 14

*In re Mexico Money Transfer Litig.,*
164 F. Supp. 2d 1002 (N.D. Ill. 2000) .................................................................................. 20

*In re Southwest Airlines Voucher Litig.,*
No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735 (N.D. Ill. Dec. 6, 2013) ............................. 20

*Isby v. Bayh,*
75 F.3d 1191 (7th Cir. 1996) ........................................................................................... 12, 13

*Kramer v. Autobytel,*
No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012)....................... 15

*Malta v. Fed. Home Loan Mortg. Corp.,*
No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013)............................. 15

*McKinnie v. JP Morgan Chase Bank, N.A.,*
678 F. Supp. 2d 806 (E.D. Wis. 2009)................................................................................... 20

*Phillips Randolph Enters., LLC v. Rice Fields,*
No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027 (N.D. Ill. Jan. 11, 2007) ............................... 18

**TABLE OF AUTHORITIES**
(continued)

*Savanna Group, Inc. v. Trynex, Inc.,*
No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013) ................................. 17

*Schulte v. Fifth Third Bank,*
805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................................... 19

*Synfuel Techs, Inc. v. DHL Express (USA), Inc.,*
463 F.3d 646 (7th Cir. 2006) ............................................................................. 14

**Statutes**

28 U.S.C. § 1715 ............................................................................................... 11

47 U.S.C. § 227(b)(1)(A) ...................................................................................... 2

**Rules**

Fed. R. Civ. P. 23(e)(2) ...................................................................................... 13

**Treatises**

4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) ................................................... 12

*Manual for Complex Litigation* (Fourth) (2004) § 21.63 .......................................... 12

Michael O'Rielly, FCC Commissioner, <u>TCPA: It is Time to Provide Clarity,</u>
FCC Blog (Mar. 25, 2014) .................................................................................. 17

**Regulations**

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection
Act of 1991,* 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F)
877, 2008 WL 65485 (F.C.C.) ............................................................................. 16

-iv-

I.    **INTRODUCTION**

On July 29, 2014, the Court granted preliminary approval of the proposed Class Settlement. Dkt No. 137. Per the Court-approved notice plan, direct individual notice of the Settlement was disseminated to over 95% of Class Members. Dkt. No. 132, ¶ 12; Dkt. No. 177, ¶ 29. In addition to the Court-approved plan, an additional email reminder was sent to over 10.3 million Class members near the end of the claims period, at Class counsel's expense. (*See* Declaration of Orran Brown Concerning Claims, Opt-Outs, and Objections ("Brown Decl."), ¶ 19.)[1] Additional targeted notice was also accomplished through a comprehensive program of internet banner advertisements on strategic websites most likely to be visited by Class Members. Dkt. No. 132, ¶ 12. A state-of-the-art, user-friendly claims process allowed Class Members to file claims through a simple, postage-prepaid postcard, an internet website, or a toll-free phone number. Although Class Members have until November 26, 2014 to submit claims, to date over *one point two-five (1.25) million Class Members* have submitted claims forms, while just 457 persons[2] have timely asked to be excluded and 14 have timely objected (six have untimely objected). Dkt. No. 137, ¶ 25.[3] Plaintiffs respectfully submit that the robust number of claims speaks to the effectiveness of the notice plan, and the ease and efficiency of the claims administration program negotiated by Class counsel.

The overwhelmingly positive reaction from Class Members also underscores the value the Class places on the Settlement obtained. As the Court knows, the Settlement includes both

---

[1] Class Counsel will provide an updated declaration from the Settlement Administrator listing the final number of claims prior to the Final Approval hearing.

[2] Class Counsel have proposed that a small number of pro se Class Members who made reasonable attempts to exclude themselves from the Class, but failed to opt-out by the October 27, 2014 Opt-Out Deadline, be permitted to do so. (Declaration of Jonathan D. Selbin in Support of Plaintiffs' Motion for Final Approval (Selbin Decl."), ¶ 36.) Capital One refuses to permit these Class Members to opt out, even though parties routinely agree to limited opt-out such as this. (*Id.*). In Class counsel's experience, parties routinely agree to allow pro se litigants who made reasonable attempts to comply with an opt-out deadline to do so, and courts routinely approve such agreements in the interests of equity. (*Id.*, ¶ 37.)

[3] Brown Decl., ¶¶ 26-27 & Attachments 12 & 13.

practice changes and monetary relief.  It requires Defendants Capital One Bank (USA), N.A., Capital One, N.A., Capital One Financial Corporation, Capital One Services, LLC, Capital One Services II, LLC (together, "Capital One") to stop the automated calls at the heart of this litigation to ensure compliance with the TCPA.  In addition, Defendants will pay the total sum of $75,455,0098.74 into a non-reversionary cash fund out of which claiming Class Members will be paid.  Upon approval, the net proceeds of the Settlement Fund will be distributed pro rata to every claimant; no money will revert back to Defendants.  Plaintiffs respectfully submit that this result is outstanding, particularly in view of the risks and delays involved in litigating the substantive merits of these claims, and the difficulties inherent in pursuing these claims individually for the overwhelming majority of Class Members.

For the foregoing reasons, and as detailed below, Plaintiffs respectfully submit that the Settlement meets the standards for, and warrants, final approval.

## II.    STATEMENT OF THE FACTS

The factual and procedural background of this litigation was set forth in detail in Plaintiffs' Amended Memorandum in Support of Motion for Preliminary Approval (Dkt. No. 129).  For the Court's convenience, Plaintiffs provide a short summary of the facts below.

### A.    The TCPA Claims

Plaintiffs alleged that Defendants called Plaintiffs and Class Members on their cell phones through the use of automatic telephone dialing systems and/or using an artificial or prerecorded voice without their prior express consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A).  Defendants deny all of Plaintiffs' allegations and argue that they had express consent to make automated, prerecorded calls to Plaintiffs and Class Members on their cell phones under both their interpretation of the FCC's January 4, 2008 declaratory ruling and language contained within the Capital One Customer Agreement.

- 2 -

**B.      Plaintiffs Thoroughly Litigated the TCPA Claims Efficiently Through Complex MDL Litigation**

The Settlement is the result of over three years of hard-fought litigation involving four separate class actions, three of which were transferred to the Northern District of Illinois by the Judicial Panel on Multidistrict Litigation ("JPML").

**1.      The Class Actions**

Plaintiff Nicholas Martin originally filed a class action complaint against Leading Edge in the United States District Court, Northern District of Illinois, Case No. 1:11-05886, on August 25, 2011.  The original complaint did not name Capital One as a defendant; Martin added Capital One as a defendant and Mack as a plaintiff on January 18, 2012.  Plaintiff Mack and Capital One had moved into discovery motion practice (*see* Dkt. No. 87) when the *Mack* Action was found to fall within the scope of this action and re-assigned to this Court (*see* Dkt. No. 115).

On January 20, 2012, Amadeck and Felix Hansen filed a Complaint in the Superior Court of Washington in and for the County of King captioned *Amadeck et al. v. Capital One Financial Corp. and Capital One Bank (USA), NA*, Case No. 12-2-D2641-6 SEA.  On February 12, 2012, Capital One removed the case to the United States District Court for the Western District of Washington.  The Amadeck Plaintiffs had served discovery and moved for leave to amend the complaint and modify the scheduling order when the case was stayed pending transfer to this Court.

On February 14, 2012, Patterson filed a Complaint in the United States District Court for the Northern District of Illinois captioned *Patterson v. Capital Management Services, LP*, Case No. 12-cv-01061 (N.D. Ill.) (Holderman, J.) (the "*Patterson* Action").  The Complaint named CMS as a defendant.  Capital One was added as a defendant on February 21, 2012.  This Court had denied a motion to dismiss for lack of subject matter jurisdiction and Magistrate Judge Sheila Finnegan granted Plaintiff Patterson's motion to compel class discovery against CMS (*see* Dkt. No. 55) when this Court granted Capital One's motion to stay the case pending the JPML

- 3 -

decision to transfer for coordinated or consolidated Pretrial proceedings under 28 U.S.C. § 1407. (*See* Dkt. No. 67.)  The case was later transferred to this action.  (*See* Dkt. No. 73.)

On August 7, 2012, Alarcon filed a nationwide class action in the Northern District of California captioned *Alarcon v. Cap. One Bank (USA) N.A., et al.*, Civ. No. 3:12-CV-4145 (N.D. Cal.) (the "*Alarcon* Action").  Alarcon voluntarily dismissed this lawsuit on October 1, 2012, to join the *Amadeck* Action.  (Selbin Decl. ¶ 10.)

### 1. The Multi-District Litigation

Plaintiffs' counsel in the class actions described above worked collaboratively to prosecute these actions in the most efficient—and more importantly, the most effective—manner possible. (*Id.* ¶ 11.)  They consolidated their efforts and engaged in motion practice before the JPML to transfer and consolidate these actions to a single forum.  (*Id.*)

On December 10, 2012, the JPML transferred the *Mack*, *Amadeck*, and *Patterson* class actions and related individual actions involving TCPA claims filed against Capital One to the Northern District of Illinois.  *See In re Capital One Telephone Consumer Protection Act Litigation*, MDL No. 2416, Dkt. No. 1.  Plaintiffs filed a Consolidated Master Class Action Complaint ("Master Complaint") on February 28, 2013, against Capital One, Leading Edge, and CMS.  *See Id.*, Dkt. 19.  The Master Complaint superseded the complaints filed in the Mack, Amadeck, and Patterson Actions, and was amended on June 13, 2014, to add plaintiff Kalik, AllianceOne, and four other Capital One entities: Capital One, N.A., Capital One Financial Corporation, Capital One Services, LLC, and Capital One Services II, LLC.  *Id.,* Dkt. No. 120.

### 2. The Parties' Mediations

Prior to mediation, Capital One produced discovery, including the class data, requested by Plaintiffs.  (Selbin Decl. ¶ 12.)  The parties named in the Master Complaint participated in three in-person (July 2 and November 4, 2013 and January 29, 2014) and two telephonic mediation sessions before the Honorable Edward A. Infante (Ret.) of JAMS. (*Id.* ¶ 13.)  At all times, the settlement negotiations were highly adversarial, non-collusive, and at arm's length.

- 4 -

(*Id.* ¶ 14.)  The extensive negotiations included briefing on the parties' respective legal and factual arguments over a seven-month period.  (*Id.*)  Capital One and Plaintiffs agreed to settle only in the days following the January 29, 2014, mediation and only after Judge Infante made a mediator's proposal to bridge the remaining gap. (*Id.* ¶ 15.)  CMS, Leading Edge, and AllianceOne (together "Participating Vendors") agreed to participate in the Settlement in the months thereafter.  (*Id.*)

### 3.    <u>Confirmatory Discovery</u>

In addition to the discovery previously provided, Plaintiffs served confirmatory discovery requests on Capital One and the Participating Vendors, including interrogatories asking them to identify the total number of Settlement Class Members and to describe all changes to their business practices required by the Settlement.  (*Id.* ¶ 16.)  Plaintiffs also asked Capital One to identify all Capital One affiliates and Participating Vendors that made automated calls during the class period.  (*Id.*) Capital One and the Participating Vendors replied to these discovery requests in a timely manner, and supplied complete and comprehensive information.  (*Id.*)

Plaintiffs also conducted four depositions of Rule 30(b)(6) designees for Capital One and the three Participating Vendors, including questioning regarding the subject matter of the discovery requests described above. (*Id.* ¶ 17.)  Even after preliminary approval, the confirmatory discovery was ongoing, including meeting and conferring regarding additional confirmatory discovery to document the implementation of the business practice changes.  (*Id.* ¶ 18.)

### C.    <u>The Proposed Settlement</u>

The Settlement's terms were summarized in Plaintiffs' preliminary approval papers, and are contained in the Settlement Agreement that is attached to the Amended Declaration of Jonathan D. Selbin in Support of Plaintiffs' Amended Memorandum in Support of Motion for Preliminary Approval (Dkt. No. 131: Exh. 1 (Agreement)).  The main terms are summarized below for the Court's convenience.

- 5 -

### 1. **The Settlement Class**

The Settlement Class is defined as follows:

> All persons within the United States who received a non-emergency telephone call from Capital One's dialer(s) to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect on a credit card debt from January 18, 2008, through June 30, 2014, and all persons within the United States who received a non-emergency telephone call from a Participating Vendor's dialer(s) made on behalf of Capital One to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect on a credit card debt from February 28, 2009, through June 30, 2014.

*Id.* § 2.39. The Class is estimated to include 16,645,221 persons. *See* Dkt. No. 177, ¶ 29.

### 2. **Injunctive Relief for All Settlement Class Members**

Several objectors argue that there have been no meaningful practice changes (*see* Dkt. No 202 at 4-5; Dkt. No. 217; Dkt. No. 227 at 2-3), but this is flat-out wrong. As detailed in Class Counsel's Memorandum in Support of Motion Final Approval of the Class Action Settlement, Capital One has developed and implemented significant enhancements to its calling systems designed to prevent the calling of a cellular telephone with an autodialer unless the recipient of the call has provided prior express consent within the meaning Plaintiffs and Class Counsel—not TCPA defendants—give it. Agreement § 4.01. The practice changes that Class counsel obtained are a tremendous result and will benefit every one of the millions of Class members, as well as other Capital One customers.

Specifically, Capital One has instituted a protocol under which it places calls to a cellular telephone number using its dialer(s) only where the cellular telephone number was provided on the customer's application for credit. (Selbin Decl., ¶ 20.) In other words, Capital One's practices are now consistent with Plaintiffs' interpretation of the FCC's 2008 Declaratory Ruling. Therefore, under Capital One's protocol, it is not placing autodialed calls to consumers' cellular

1203235.7

telephones unless it obtained prior express consent under the TCPA as Plaintiffs allege it must be construed. (*Id.*)

In addition, effective July 1, 2014, Capital One has only been dialing such numbers (that were provided on a customer's credit application) if one of two additional conditions is also met, namely, either: (1) the cellular telephone number is specifically linked to the customer's name based on third party research; or (2) Capital One has made contact with the customer on the cellular telephone number within the past 90 days. (*Id.* ¶ 21.) In other words, Capital One is not relying solely on the fact that a number appears in a credit application for assurance that the number still belongs to one of its customers. Recognizing that people sometimes change their cellular telephone numbers, this avoids the circumstance in which a Capital One customer enters a particular number on a credit application, then changes that number, and some different person takes that same number who is then autodialed by Capital One. With this new protocol in place, Capital One has reduced the probability that it will make an automated call to someone with whom it has had no business dealings. This business practice change, therefore, provides a great benefit.

Capital One has also improved its processes to stop calling a cellular telephone number if the called party requests. In other words, every Class member who wants the automated calls to stop has the ability to make the calls stop.

### 3. Monetary Relief for Settlement Class Members

The Settlement also requires Defendants to create a non-reversionary Settlement Fund of $75,455,098.74. Agreement § 2.42. Out of this Settlement Fund, eligible Settlement Class Members who file a qualified claim will receive a Cash Award. Agreement §§ 2.06, 4.04. The amount of each Class Member's Award will be based on a *pro rata* distribution, depending on the number of valid and timely claims. *Id.* § 4.04. No amount of the Settlement Fund will revert to Defendants. *Id.* §§ 2.42, 4.04. While it is not yet possible to predict the precise amount of the Cash Awards until all claims have been submitted, assuming that an additional 68,000

- 7 -

Class Members submit claims between now and the November 26, 2014 deadline (for a total of approximately 1,352,000 eligible claims), and the Court awards the requested attorneys' fees and service awards, Class Members stand to receive approximately $35.35 to & $37.24 each. (Brown Decl., ¶¶ 36, 38.)   That is on the high end of the $20 - $40 estimated amount per Class Member that was included in the notice sent to the Class.  *See* Dkt. No. 131-1 (Ex. 1. (Ex. B1: Email notice; B2: Postcard Notice; B3: Long Form Notice).

In the event that the combined amounts of any settlement payment checks to Class Members that remain uncashed for more than 210 days after the first pro rata distribution yield an amount that, after administration costs, would allow for a second pro rata distribution to the qualifying Settlement Class Members equal to or greater than $1.00 per Settlement Class Member, then a second *pro rata* distribution will be made to all Class Members who made valid and timely claims.  Agreement § 7.04(e).  In the event that a second pro rata distribution is not made, or in the event that one is made but checks remain uncashed after 210 days, the money will be distributed *cy pres* to a non-profit to be agreed to by the Parties and approved by the Court.  Agreement § 7.03(f)-(g).

### 4.    Class Release

In exchange for the benefits under the Settlement, Class Members who do not opt out will provide a release tailored to the practices at issue in this case.  Specifically, they will release all claims "that arise out of or relate in any way" to the "use of an 'automatic telephone dialing system' or an 'artificial or prerecorded voice' to contact or attempt to contact Settlement Class Members in connection with Capital One's Credit Card Accounts."  Agreement § 14.01.  As such, the class release does not release similar claims that some Class Members may have, such as those that fall under the Fair Debt Collection Practices Act.

### 5.    Attorneys' Fees and Class Representative Service Awards

On September 29, 2014, Class Counsel moved the Court for an award of attorneys' fees in the amount of 30% of the Settlement Fund (costs included), and for service awards to be paid

- 8 -

to the Plaintiffs from the Settlement Fund in the amount of $5,000 each, or $25,000 total.  Dkt. No. 175.  Neither approval nor enforceability of the Settlement is contingent on Court approval of a specific award of attorneys' fees or costs or service awards.  Agreement § 5.03.  That is to say, the substantive terms of the Class Settlement are enforceable so long as the Court approves it, regardless of the amount of fees and costs awarded.

## III.    CLASS NOTICE HAS BEEN DISSEMINATED

The notice program approved by the Court (Dkt. No. 137) has been fully and successfully implemented by the parties and the Court-approved Settlement Administrator, BrownGreer PLC ("BrownGreer"), in accordance with the Court's direction.  (*See* Brown Decl. ¶¶ 3, 39.)

### A.    Direct Mail and Email Notice

Beginning on August 12, 2014 and continuing through August 27, 2014, BrownGreer disseminated 12,342,003 summary notices via email to all potential Settlement Class Members who had email addresses reflected in Capital One's reasonably available computerized account records and who had not opted out of receiving email from Capital One in accordance with Capital One's current existing email opt-out policies.  (Brown Decl., ¶ 17.)  BrownGreer also disseminated 4,303,218 summary postcard notices via first class mail to class Members who had opted out pursuant to the policy describe above, for whom Capital One did not have email addresses, and to the 1,629,206 Class Members whose emails were undeliverable.  (Brown Decl., ¶¶ 21, 23.)  BrownGreer sent notice via first class mail to the most recent mailing address reflected in Capital One's reasonably available computerized account records, and confirmed or updated those addresses by: (1) checking addresses against the United States Post Office National Change of Address Database before the initial mailing; (2) conducting a reasonable search to locate an updated address for Class Members whose Notice was returned as undeliverable; (3) updating addresses based on any forwarding information received from the United States Post Office; and (4) updating any addresses base on requests received from Class Members.  Mailed notices that were returned to BrownGreer with forwarding information were

- 9 -

promptly re-mailed to the updated addresses. BrownGreer was also able to re-mail 734,256 of the 924,916 mailed notices that were returned without forwarding information by conducting advanced address searches. (Brown Decl., ¶ 22.) Finally, BrownGreer also sent a second round of email late in the claims period, to remind Class Members of the impending deadline, paid out-of-pocket by Class Counsel.

In total, 16,089,216 of the approximately 16,645,221 known Class Members (over 96.66% of the known Class) were given direct individual notice of the Settlement. (Brown Decl., ¶¶ 11, 30.)

### B.    Internet Notice

Between August 28, 2014 and September 28, 2014, internet banner notices ran on the forty websites identified by BrownGreer's media experts as likely to be visited by Class Members. (Brown Decl., ¶ 24 & Attachment 5.) The internet banner notices contained a hyperlink which lead user to the official Settlement Website, described below. In addition, BrownGreer optimized retrieval of the Settlement Website from internet search engines such as Google, Yahoo!, and Bing by purchasing certain keywords relevant to the case. (Brown Decl., ¶ 25.)

### C.    Settlement Website and Toll-Free Number

On August 12, 2014, BrownGreer established a Settlement Website (www.capitalonetcpaclasssettlement.com) where Class Members may go for information or to submit a claim electronically. (Brown Decl., ¶ 12.) The Settlement Website contains the following documents: (1) Amended Memorandum in Support of Unopposed Motion for Preliminary Approval (with exhibits); (2) Amended Settlement Agreement; (3) the Claims Form; (4) Long-form Notice; (5) the Preliminary Approval Order; (6) the Amended Consolidated Master Class Action Complaint; (7) a Contact Information Update Request Form; (8) Class Counsel's Motion for Attorneys' Fees and Service Awards to the Class Representatives (with

exhibits); and (9) the Declaration Regarding Class Counsel's Attorneys' Fees and Costs. *(Id.)* To date, the website had received 610,401 unique visitors. (Brown Decl., ¶ 31.)

In addition, on August 12, 2014, BrownGreer established a toll-free telephone number dedicated to answering telephone inquiries from Class Members and permitting Class Members to file a claim over the phone. (Brown Decl., ¶13.) To date, BrownGreer had received 101,586 calls. (Brown Decl., ¶ 32.) Class counsel have also responded to well over a thousand inquiries from Class Members regarding the Settlement. (Selbin Decl., ¶ 22.)

### D.  CAFA Notice

BrownGreer provided notice of the Settlement to the officials designated pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. To date, there have been no objections from any of the Attorneys' Generals to Class counsel's knowledge.

## IV.  THE CLAIMS ADMINISTRATION PROGRAM UTILIZED BEST PRACTICES

### A.  Claims Administration

The Settlement included three straightforward, user friendly ways for Class members to file claims. First, Class members could return a simple postage-paid postcard to participate. Second, Class members could complete the simple form at the Settlement website, including through a direct link for all Class members who received email notice. Third, Class members could dial a toll-free number to complete a simple claims process. In other words, Class members had three easy ways to file a claim. Not surprisingly, the claims rate here has surpassed claims rates for other similar consumer settlement programs. (Brown Decl., ¶ 35)

### B.  Settlement Administration Costs

The costs of settlement administration and notice as of November 17, 2014 totaled approximately $3,906,500. (Brown Decl., ¶ 37.) BrownGreer estimates that administration and notice costs through completion will be approximately $4,998,500. *(Id.)*

- 11 -

## V.    FINAL APPROVAL IS WARRANTED

### A.    The Settlement Approval Process

As the Seventh Circuit has recognized, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, 'there is an overriding public interest in favor of settlement.' Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases). The traditional means for handling claims like those at issue here— individual litigation—would unduly tax the court system, require a massive expenditure of public and private resources and, given the relatively small value of the claims for most of the individual Class Members, would be impracticable. Thus, the proposed Settlement is the best vehicle for Class Members to receive relief to which they are entitled in a prompt and efficient manner.

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step procedure for approval of class action settlements:

(1)    Preliminary approval of the proposed settlement at an informal hearing;

(2)    Dissemination of mailed and/or published notice of the settlement to all affected class members; and

- 12 -

(3)     A "formal fairness hearing" or final settlement approval
hearing, at which class members may be heard regarding the
settlement, and at which evidence and argument concerning
the fairness, adequacy, and reasonableness of the settlement
may be presented.

The first two steps in this process have occurred. With this motion, Plaintiffs respectfully request that the Court take the third and final step in the process by granting final approval of the Settlement.

**B.**     **The Settlement is Fair, Reasonable, and Adequate, and Should be Approved**

A proposed class action settlement should be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). When determining whether a settlement is ultimately fair, adequate, and reasonable at the final approval stage, courts in this Circuit consider the following factors:

(1)     the strength of plaintiffs' case compared to the terms of the
proposed settlement;

(2)     the likely complexity, length, and expense of continued
litigation;

(3)     the amount of opposition to settlement among affected
parties;

(4)     the opinion of competent counsel; and

(5)     the stage of the proceedings and the amount of discovery
completed.

*Isby*, 75 F.3d at 1199. In reviewing these factors, courts view the facts "in a light most favorable to the settlement." *Id.* (quoting *Armstrong,* 616 F.3d at 315). In addition, courts "should not substitute their own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong*, 616 F.2d at 315.

Application of these factors here confirms that the settlement is fair, reasonable, and adequate, and should be finally approved.

- 13 -

1. **The Strength of the Plaintiffs' Case Compared to the Terms of the Proposed Settlement Supports Final Approval**

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs, Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig*., 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

a. **The Monetary Amount And Injunctive Relief Offered in Settlement Supports Final Approval**

The Settlement is a remarkable result for the Class. It requires Defendants to pay $75,455,0098.74 into a Settlement Fund out of which all eligible Class Members who make a claim will receive their *pro rata* share of cash payments. The Settlement Fund is non-reversionary, ensuring that all or nearly all monetary benefits will go to Class Members—no amount of the Settlement Fund will return to Defendants.

Although the $75,455,098.74 fund does not constitute the full measure of statutory damages potentially available to the Class, this fact alone should not weigh against final approval. "Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong*, 616 F.2d at 315. The Settlement was reached after significant factual investigation and discovery of the claims and issues and after taking into consideration the risks involved in the actions, after multiple arm's length negotiations presided over by an experienced mediator and former judge, and via a mediator's proposal made after the parties had reached impasse and negotiations had ceased. Further, the Settlement compares favorably to other TCPA class actions settlements. Indeed, courts have approved other TCPA class action settlements involving

- 14 -

similarly large putative classes that achieved much smaller *pro rata* monetary recoveries.[4]  In addition, this is a debt collection rather than a telemarketing case, making the issue of consent central to Capital One's defense—both as to class certification and on the merits.

Furthermore, as discussed above, the Settlement requires Capital One to make significant business practice changes to prevent the calling of a cellular telephone with an autodialer unless the recipient of the call has provided prior express consent.  Capital One has also made additional changes to ensure that it only dials current numbers, to reduce the probability that it will make an automated call to someone with whom it has had no business dealings.  These changes are a critical component of the Settlement.

Moreover, as discussed further below, continuing to litigate the claims would entail significant risk and delay.  The key here is that the Settlement provides critical injunctive relief and real monetary relief, despite the fact that this is a purely statutory damages case in which Class Members incurred nominal or no economic damages or whose actual damages (such as stemming from the invasion of their privacy) are difficult or impossible to quantify.

        **b.**       **<u>The Strength of Plaintiffs' Case Supports Final Approval</u>**

Plaintiffs continue to believe that their claims against Defendants have merit and that they could make a compelling case if their claims were tried.  Nevertheless, Plaintiffs and the Class would face a number of difficult challenges if the litigation were to continue.

First, the Parties have competing interpretations of what constitutes "prior express consent" under the TCPA based on the FCC's January 4, 2008 declaratory ruling, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23

---

[4] *See, e.g., Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) (approving $12.2 million settlement to benefit 47 million class members); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-1290, 2013 U.S. Dist. LEXIS 15731 (S.D. Cal. Feb. 5, 2013) (preliminarily approving $17.1 million settlement to 5,887,508 class members; final approval granted at Dkt. No. 91); *Adams v. AllianceOne Receivables Mgmt. Inc.*, No. 08-cv-00248, Dkt. Nos. 116 & 137 (S.D. Cal.) (attached as Exhibits H & I to Selbin Decl.) (approving $9 million settlement to benefit 6,696,743 class members); *Palmer v. Sprint Nextel Corp.*, No. 09-cv-01211, Dkt. Nos. 84 & 91 (W.D. Wash.) (attached as Exhibits J & K to Selbin Decl.) (approving $5.5 million settlement to benefit 18.1 million class members).

F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (hereinafter "Declaratory Ruling").  The Declaratory Ruling is the FCC's official interpretation of the governing provisions of the TCPA.  The FCC's Declaratory Ruling addresses the meaning of "prior express consent" and states that "prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."  Plaintiffs maintain that Paragraph 10 requires that the cell phone number be "provided during the transaction that resulted in the debt owed," *i.e.* during the "origination" of the credit or banking relationship. Capital One, however, interprets the term "transaction" broadly to mean any time during the multi-year life of the relationship.  Based on this interpretation, Capital One maintains that most or even all of the Class Members gave it prior express consent to contact them at their cell phone numbers.  If the Court found that the FCC's Declaratory Ruling and/or the TCPA permits "prior express consent" to be given: (1) any time after origination on documents such as correspondence, updated information forms, forbearance requests, and the like, and/or (2) verbally, the amount of recoverable damages could be reduced significantly or eliminated altogether.  *See, e.g., Arthur v. Sallie Mae, Inc.,* No. 10-cv-132413, 2012 U.S. Dist. LEXIS 132413, at *4 (W.D. Wash. Sept. 17, 2012) (granting final approval of TCPA settlement "in part because of the novelty of central issues"); *see also Elkins v. Medco Health Solutions, Inc.*, Case No. 4:12CV2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014) (granting summary judgment against Plaintiff); *Greene v. DirecTV, Inc.*, Case No. 10-C-117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) (granting summary judgment against Plaintiff in TCPA class case).

Indeed, banks and other entities have been actively lobbying the FCC to clarify the meaning of consent under the TCPA, and the FCC is currently considering multiple petitions on this issue.  The FCC could issue a ruling at any time which might undermine Plaintiffs' interpretation.  *See, e.g., Higginbotham v. Hollins*, No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) (staying litigation pending FCC's consideration of and rulings on

- 16 -

TCPA petitions and citing cases granting similar stays); s*ee also* Michael O'Rielly, FCC Commissioner, <u>TCPA: It is Time to Provide Clarity</u>, FCC Blog (Mar. 25, 2014) (*available at* http://www.fcc.gov/blog/tcpa-it-time-provide-clarity) (asserting that "the FCC needs to address this inventory of petitions as soon as possible" as it has the "opportunity to answer important questions and much needed guidance on a variety of TCPA issues, including . . . whether consent can be inferred from consumer behavior or social norms . . . .").

Second, while Plaintiffs continue to believe that class certification would be achievable, Capital One consistently argued that class certification would be inappropriate due to the question of whether Class Members consented to the calls at issue. If the Court were to accept Capital One's interpretation of "prior express consent" under the statute, identifying which class members consented and in what manner could be difficult. And, "[c]ourts are split on whether the issue of individualized consent renders a TCPA class uncertifiable on predominance and ascertainability grounds, with the outcome depending on the specific facts of each case." *Chapman v. First Index, Inc*., No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556, at *6-7 (N.D. Ill. March 4, 2014) (citing cases). For example, in *Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, at *49 (N.D. Ill. Jan. 4, 2013), the court granted class certification and rejected the defendant's argument that questions of consent caused individual issues to predominate, noting that the defendant had not offered evidence tending to show that any particular class member consented to the faxes at issue, whereas in *G.M. Sign, Inc. v. Brinks Manufacturing Company*, No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084, at *7-10 (N.D. Ill. March 4, 2014), the court declined to certify a class, finding that the defendant offered evidence illustrating that consent could not be shown with common proof. If Capital One were able to present convincing facts to support its position, there is a risk that the Court would decline to certify the class, leaving only the named Plaintiffs to pursue their individual claims.

Third, Capital One maintains that it actually obtained prior express consent to call its customers through the Capital One Customer Agreement. For example, one Agreement in effect during the Class period states: "[w]hen you give us or we obtain your mobile telephone number,

we may contact you at this number using an Autodialer."[5]  Plaintiffs believe that this language does not provide prior express consent for numerous reasons, including that it does not provide permission to contact a customer in violation of the TCPA, but recognize that this language presented a case-dispositive risk for nearly the entire Class.  Capital One also argues its TCPA terms are non-revocable contractual provisions.  Capital One further argues that this language goes beyond the requirements of the TCPA, and that it constitutes express, written consent to auto-dial customers, who agreed to be bound by the terms in exchange for using their Capital One credit cards.   Although the issue of revocation of consent has been litigated in many courts, no court has ruled on whether contractual consent can be revoked.  Although Plaintiffs believed that they would have prevailed on this issue, Capital One has a number of strong arguments in its favor.

Fourth, at least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards—even after a plaintiff has prevailed on the merits—on due process grounds.  *See, e.g., Aliano v. Joe Caputo & Sons - Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323, at *13 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation—would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature."); *but see Phillips Randolph Enters., LLC v. Rice Fields*, No. 06 C 4968, 2007 U.S. Dist. LEXIS 3027, at *7-8 (N.D. Ill. Jan. 11, 2007) ("Contrary to [defendant's] implicit position, the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable, particularly for multiple violations.").

Finally, there is a risk of losing a jury trial and/or on appeal.  The Settlement provides substantial relief to Class Members without risk or delay.

---

[5] *See* http://www.capitalone.com/media/doc/credit-cards/consumer-cards.pdf (last visited November 10, 2014).

> **2.    Continued Litigation is Likely to be Complex, Lengthy, and Expensive, and Thus This Factor Favors Final Approval**

Litigation would likely be lengthy and expensive if this action were to proceed. Although the parties engaged in extensive discovery efforts, the parties would need to engage in significant additional discovery, including additional depositions. There would also be further motion practice, including Plaintiffs' motion for class certification, as well as a petition for review of that ruling under Rule 23(f), and certainly one or more motions for summary judgment brought by Defendants. The parties might also engage experts to analyze Defendants' call data. It would likely be well over a year before the case went to trial. And, any judgment in favor of Class Members could be further delayed by the appeal process. Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Plaintiffs and Class Members to receive immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (citation omitted) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

> **3.    Class Member Response Has Been Overwhelmingly Positive to the Settlement, Supporting Final Approval**

Class Members' response to the Settlement has been overwhelmingly positive. The deadline for Class Members to submit claims is not until November 26, 2014. Yet, over one 1.25 million Class Members have already filed claims. (Brown Decl., ¶ 35.) Class Counsel expect that many more Class Members will make claims. Only 457 Class Members of the more than 16 million Class Members timely requested to be excluded from the Settlement, representing approximately .00003% of the Class. (Brown Decl., ¶ 26.) And, only 14 Class Members validly and timely objected to the Settlement, representing only .000001% of the known class. (*Id.*) Many of these objections were submitted by so-called "professional" or "serial" objectors who regularly make objections to class action settlements for their own pecuniary gain or political agendas. *See* Class Counsel's Response to Objections, filed concurrently herewith. This factor therefore favors final approval. *See, e.g., Isby* 75 F.3d at 1200 (affirming final approval of settlement where 13% of the class submitted written

- 19 -

objections); *In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *21 (N.D. Ill. Dec. 6, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement").

### 4.    Class Counsel Strongly Endorse the Settlement

Class Counsel and Plaintiffs strongly endorse this Settlement and believe that it represents a great result for Class Members.  (Selbin Decl., ¶ 23.)  Class Counsel's opinion on the Settlement is entitled to great weight, particularly because: (1) Class Counsel are competent and experienced in class action litigation (particularly in similar TCPA class action cases); (2) Class Counsel engaged in formal and informal discovery and exhaustively evaluated the claims in the context of settlement negotiations; and (3) the Settlement was reached at arm's length through negotiations by experienced counsel, after three full-day, in-person and two telephonic mediations before an experienced mediator and former judge, and after the parties accepted the mediator's proposal. (*Id.* ¶¶ 13-15.)  *See McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator. . . suggest that the settlement is fair and merits final approval."); *see also In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").

### 5.    The Stage of the Proceedings and the Amount of Discovery Completed Supports Final Approval

The Settlement was informed by Class Counsel's thorough litigation and analysis of the factual and legal issues involved.  It is the result of three years of litigation including dispositive motion and substantial discovery practice in two of the individual class actions, and, written discovery and document production in three of the individual class actions, followed by a series of contentious meet and confers and preparation for motion practice in this action.  Plaintiffs' counsel obtained and analyzed a complete set of the contractual language at issue during the Class Period and, in advance of mediation, requested and analyzed data and documents about

- 20 -

Capital One's policies and procedures to permit informed and meaningful settlement discussions. (*Id.* ¶ 12.)

As noted above, the parties participated in mediation before the Honorable Edward A. Infante (Ret.) of JAMS. (*Id.* ¶ 13.) Prior to the mediations, Capital One, Leading Edge, and Plaintiffs submitted detailed mediation briefs, setting forth their respective views on the case. (*Id.* ¶ 12.) The parties discussed their relative views of the law and the facts and potential relief for the proposed Class. (*Id.* ¶ 14.) As the negotiations evolved, Class counsel requested, and Capital One provided, additional data and documents for Class counsel to analyze. (*Id.*)

Counsel exchanged a series of counterproposals on key aspects of the Settlement, including monetary relief for the Class, notice to the Class and the meaning and interpretation of the eligibility requirements. (*Id.*) At all times, the settlement negotiations were highly adversarial, non-collusive, and at arm's length. (*Id.*) Capital One and Plaintiffs agreed to a Settlement only in the days following the January 29, 2014, mediation and after Judge Infante made a mediator's proposal. (*Id.* ¶ 15.) The Participating Vendors agreed to participate in the Settlement in the months thereafter. (*Id.*)

Accordingly, the final terms of Settlement were agreed to only after Class Counsel thoroughly vetted the claims and potential damages through the exchange of both informal and formal discovery and participated in lengthy arm's length negotiations. Thus, this factor favors final approval.

**VI.     CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order granting final approval of the Settlement.

- 21 -

1203235.7

Dated:  November 18, 2014                Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


By:   _/s/ *Jonathan D. Selbin*_____
             Jonathan D. Selbin

Jonathan D. Selbin
Email:  jselbin@lchb.com
Douglas I. Cuthbertson
Email:  dcuthbertson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

Daniel M. Hutchinson
Email:  dhutchinson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Co-Lead Counsel*

TERRELL MARSHALL DAUDT
  & WILLIE PLLC


By:   _/s/ *Beth E. Terrell*_____
             Beth E. Terrell

Beth E. Terrell
Email:  bterrell@tmdwlaw.com
Michael D. Daudt
Email:  mdaudt@tmdwlaw.com
TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103
Telephone:  (206) 816-6603
Facsimile:   (206) 350-3528

*Co-Lead Counsel*

- 22 -

KEOGH LAW, LTD

By:   /s/ *Keith James Keogh*
            Keith James Keogh

Keith James Keogh
Email: Keith@Keoghlaw.com
Craig M. Shapiro
Email: cshapiro@keoghlaw.com
Timothy J. Sostrin
Email: tsostrin@keoghlaw.com
KEOGH LAW, LTD
55 W. Monroe
Suite 3390
Chicago, IL 60603

Telephone:  (312) 726-1092
Facsimile   (312) 726-1093

*Liaison Counsel*

- 23 -