**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE<br>CAPITAL ONE TELEPHONE<br>CONSUMER PROTECTION ACT<br>LITIGATION | )<br>)<br>)<br>)<br>) | Master Docket No. 1:12-cv-10064<br>MDL No. 2416 |
| This document relates to:<br><br>BRIDGETT AMADECK, et al.,<br><br>    v.<br><br>CAPITAL ONE FINANCIAL<br>CORPORATION, and CAPITAL ONE<br>BANK (USA), N.A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:12-cv-10135 |
| This document relates to:<br><br>NICHOLAS MARTIN, et al.,<br><br>    v.<br><br>LEADING EDGE RECOVERY<br>SOLUTIONS, LLC, and CAPITAL ONE<br>BANK (USA), N.A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:11-cv-05886 |
| This document relates to:<br><br>CHARLES C. PATTERSON,<br><br>    v.<br><br>CAPITAL MANAGEMENT<br>SERVICES, L.P. and CAPITAL ONE<br>BANK (USA), N.A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 1:12-cv-01061 |

<u>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO OBJECTIONS TO SETTLEMENT**</u>

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................1

II. The Overwhelmingly Positive Response to the Settlement Supports Final Approval. ........................................................................................................2

III. The Objections Lack Substantive Merit and Should be Overruled. .......................3

    A. The $75,455,098.74 Settlement Fund, Coupled with the Practice Changes, is an Excellent Result for Class Members.................................3

    B. Basing Class Members' Awards on the Precise Number of Calls Received Was Not Feasible. ..........................................................................8

    C. The Requested Attorney Fee Award is Well-Supported Under Established Law. ...........................................................................................9

        1. Class Counsel's Fee Request Comports with the Seventh Circuit's Market Approach ............................................................9

        2. 30% of the Common Fund is *Less* Than the Typical Market Price in the Seventh Circuit. ..........................................................10

        3. A Lodestar Crosscheck is Not Required or Warranted.................13

        4. The Risk Involved Supports the Fee Request. ..............................16

        5. It is Appropriate to Include Administrative Costs as Part of the Fund when Calculating Attorneys' Fees.................................17

        6. The Presence of a "Clear Sailing" Clause Does Not Warrant Reducing the Fee Award..................................................19

        7. Class Counsel Need Not Identify How Attorneys' Fees Will Be Allocated Among The Various Firms Serving As Class Counsel. ..............................................................................19

    D. The Notice Provided to the Class was Exemplary and State of the Art. .............................................................................................................21

    E. The Remaining Objections Provide no Basis to Decline to Approve the Settlement..................................................................................24

    F. The Business Practice Changes Provide a Great Benefit to the Class. ...........................................................................................................24

    G. Cy pres ...............................................................................................26

IV. The Two Serial Objectors Lack Credibility..........................................................27

    A. Joseph Darrell Palmer is a Serial Objector Found Guilty By the California State Bar of Moral Turpitude for Submitting False Declarations in Support of Prior Objections to Settlements. .....................28

    B. Krystal Nykaza's Counsel John J. Pentz is a Serial Objector....................31

V. CONCLUSION.....................................................................................................33

**CASES**

*Aliano v. Joe Caputo & Sons - Algonquin, Inc.,*
   No. 09 C 910, 2011 U.S. Dist. LEXIS 48323 (N.D. Ill. May 5, 2011) ...................... 6

*Armstrong v. Board of School Directors,*
   616 F.2d 305 (7th Cir. 1980) ................................................................................ 4

*Arthur v. Sallie Mae, Inc.,*
   2012 U.S. Dist. LEXIS 132061 (W.D. Wash. Sept. 17, 2012).............................. 20

*Barnes v. FleetBoston Fin. Corp.,*
   No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) ......... 27

*Beesley v. Int'l Paper Co.,*
   No. 06-cv-703, 2014 U.S. Dist. LEXIS 12037 (S.D. Ill. Jan 31, 2014) ................. 13

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980)............................................................................................. 17

*Brown v. DIRECTV, LLC,*
   No. 12-cv-08382, 2013 U.S. Dist. LEXIS 90894 (C.D. Cal. June 26, 2013) .......... 17

*Cayanan v. Citi Holdings, Inc.,*
   928 F. Supp. 2d 1182 (S.D. Cal. 2013).................................................................. 17

*Chapman v. First Index, Inc.,* No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556 (N.D. Ill.
   March 4, 2014)...................................................................................................... 5

*City of Roseville Empls. Ret. Sys. v. Orloff,*
   2012 U.S. App. LEXIS 11512 (9th Cir. June 7, 2012) .......................................... 30

*Delgado v. US Bankcorp,*
   12-cv-10313, Dkt. No. 12 (C.D. Cal. Jan. 17, 2013) ............................................ 17

*Dupler v. Costco Wholesale Corp.,*
   705 F. Supp. 2d 231 (E.D.N.Y. 2010) ................................................................... 32

*EEOC v. Hiram Walker & Sons, Inc.,*
   768 F.2d 884 (7th Cir. 1985) ................................................................................ 4

*Elkins v. Medco Health Solutions, Inc.,*
   No. 12-cv-2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014) ............ 17

*Eubank v. Pella Corp.,*
   753 F.3d 718 (7th Cir. 2014................................................................................. 19

*Evans v. Aetna Inc.,*
   No. 13-cv-01039 (E.D. Wisc. Nov. 20, 2013) ....................................................... 17

*G.M. Sign, Inc. v. Brinks Manufacturing Company,*
   No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084 (N.D. Ill. March 4, 2014) ............... 5

*Galloway v. Kan. City Landsmen ,LLC,*
   4:11-1020, 2012 U.S. Dist. LEXIS 147148 (W.D. Mo. Oct. 12, 2012) ................. 23

*Gaskill v. Gordon,*
   942 F. Supp. 382, 386 (N.D. Ill. 1996),
   *aff'd* 160 F.3d 361 (7th Cir. 1998)................................................................. 14, 15

*Gonzalez v. Citigroup, Inc.*,
No. Civ. S-11-0795 LKK/GGH, 2011 U.S. Dist. LEXIS 135421 ............................................. 6

*Gonzalez v. J.C. Penney Co., Inc.*,
No. 2:11-cv-00794-KJM-EFB, Dkt. No. 18 (E.D. Cal. Sept. 21, 2011) ................................... 6

*Gonzalez v. JP Morgan Chase*,
No. 11-cv-00796-GEB-EFB, Dkt. No. 30 (E.D. Cal. Nov. 16, 2011) ....................................... 7

*Greene v. DirecTV, Inc.*,
No. 10-C-117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) ................................. 17

*Harman v. Lyphomed, Inc.*,
945 F.2d 969 (7th Cir. 1991) ..................................................................................................... 14

*Harper v. Credit Control Servs.*,
863 F. Supp. 2d 125 (D. Mass. 2012) .......................................................................................... 6

*Heekin v. Anthem, Inc.*,
No. 1:05-cv-01908, 2013 U.S. Dist. LEXIS 26700 (S.D. Ind. Feb. 27, 2013) ............. 12, 30, 32

*Higginbotham v. Hollins*,
No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) ................................. 5

*Hudson v. Sharp Healthcare*,
No. 13-cv-1807, Dkt. No. 56 (S.D. Cal. June 25, 2014) ........................................................... 17

*In re AOL Time Warner ERISA Litig.*,
2007 U.S. Dist. LEXIS 99769 (S.D.N.Y. Nov. 28, 2007) ......................................................... 32

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
270 F.R.D. 330 (N.D. Ill. 2010) .................................................................................................. 4

*In re Charles Schwab Corporation Securities Litig.*,
No. C 08–01510, 2011 U.S. Dist. LEXIS 18840 (N.D. Cal. Feb. 11, 2011) ............................ 31

*In re Comdisco Sec. Litig.*,
150 F.Supp.2d 943 (N.D. Ill. 2001) ........................................................................................... 14

*In re Continental Illinois Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ..................................................................................................... 15

*In re Dell Sec. Litig.*,
No. A-06-CV-726-SS, Dkt. No. 342 (W.D. Tex. Jan. 11, 2011) .............................................. 30

*In re Fesco Plastics Corp.*,
996 F.2d 152 (7th Cir. 1993) ..................................................................................................... 17

*In re GIB LLC Cases*,
J.C.C.P. No. 4657 (Cal. Super. Ct.) .......................................................................................... 30

*In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) .................................................................................... 18

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008) ..................................................................................................... 20

*In re Initial Pub. Offering Secs. Litig.*,
721 F. Supp. 2d 210 (S.D.N.Y.2010) ........................................................................................ 31

*In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.*,
No. 09 C 7670; MDL 2103, 2011 U.S. Dist. LEXIS 157910 (N.D. Ill. Nov. 30, 2011) .......... 15

1204670.6

*In re Law Office of Jonathan E. Fortman, LLC*,
No. 4:13MC00042, 2013 U.S. Dist. LEXIS 13903 (E.D. Mo. Feb. 1, 2013)...........................27

*In re Mexico Money Transfer Litig.*,
164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000), *aff'd.*, 267 F.3d 743 (7th Cir. 2001)...................2

*In re Oil Spill by Oil Rig Deepwater Horizon*,
MDL 2179, 2013 U.S. Dist. LEXIS 4595 (E.D. La. Jan. 11, 2013).........................................30

*In re Royal Ahold N.V. Securities & Erisa Litig.*,
461 F. Supp. 2d 383 (D. Md. 2006)........................................................................................32

*In re Southwest Airlines Voucher Litig.*,
No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735 (N.D. Ill. Dec. 6, 2013) ................................2

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ...............................................................................11, 13, 14

*In re Synthroid Mktg. Litig.*,
325 F.3d 974 (7th Cir. 2003) ...............................................................................11, 12, 13

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
2011 U.S. Dist. LEXIS 154288 (N.D. Cal. Dec. 27, 2011)....................................................29

*In re Uponor Inc. F1807 Plumbing Fittings*,
No.11-2247, Dkt. No. 132 (D. Minn.) ....................................................................................29

*In re Wal-Mart Wage & Hour Empl. Practices Litig.*,
2:06-CV-00225, 2010 U.S. Dist. LEXIS 21466 (D. Nev. Mar. 8, 2010) ................................32

*In Re: Checking Account Overdraft Litig.*,
MDL No. 2036, Dkt. No. 3048, (S.D. Fla. Nov. 13, 2012) ....................................................28

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ..............................................................................................2, 4

*Kitson v. Bank of Edwardsville & Harland Fin. Solutions, Inc.*,
CIVIL NO. 08-507, 2009 U.S. Dist. LEXIS 85444 (S.D. Ill. Sept. 18, 2009) ........................23

*Kramer v. Autobytel Inc., et al.*,
2:11-cv-05935-PSG-AGR (N.D. Cal.) .....................................................................................7

*Larsen v. Trader Joe's Co.*,
No. 11-cv-05188-WHO, Dkt. No. 121 (N.D. Cal. July 11, 2014)...........................................30

*Maleksaeedi v. Am. Express Centurion Bank*,
No. 11-cv-790, Dkt. No. 32 (S.D. Cal., Feb. 12, 2013) .........................................................17

*Malta v. Fed. Home Loan Mortg. Corp.*,
10-CV-1290-BEN (S.D. Cal.)...................................................................................................7

*Martin v. Caterpillar Inc.*,
No. 09-cv-1009, 2010 U.S. Dist. LEXIS 145111 (C.D. Ill. Sept. 10, 2010) ..........................15

*Martin v. Wells Fargo Bank, N.A.*,
12-cv-06030, Dkt. No. 94 (N.D. Cal. Apr. 4, 2014)...............................................................17

*McDaniel v. Qwest Communs. Corp.*,
No. 5 C 1008, 2011 U.S. Dist. LEXIS 154591 (N.D. Ill. Aug. 29, 2011)...............................15

*Mercury Interactive Corp. Sec. Litig.*,
618 F.3d 988 (9th Cir. 2010) ................................................................................................20

*Moore v. Chase Bank USA, N.A.*,
No. 12-cv-10316, Dkt. No. 10 (C.D. Cal. Jan. 9, 2013) ........................................ 17

*Nolte v. Cigna Corp.*,
No: 2:07-cv-2046, 2013 U.S. Dist. LEXIS 184622 (N.D. Ill. Oct. 15, 2013) ......................... 13

*Pavlik v. FDIC*,
No. 10 C 816, 2011 U.S. Dist. LEXIS 126016 (N.D. Ill. Nov. 1, 2011) ................................. 11

*Redman v. Radioshack Corp.*,
No. 14-1470, 2014 U.S. App. LEXIS 18181 (7th Cir. Sept. 19, 2014) ............................ 18, 19

*Salina v. NCO Fin. Syst., Inc.*,
No. 10-7496, Dkt. No. 44 (E.D. Pa. June 25, 2012) ................................................. 7

*Savanna Group, Inc. v. Trynex, Inc.*,
No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013) ................................. 5

*Schulte v. Fifth Third Bank,*
805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................................... 2, 4, 13

*Silverman v. Motorola Solutions, Inc.*,
739 F.3d 956 (7th Cir. 2013) ....................................................................... 13

*Simonet v. GlaxoSmithKline*,
No. 06-1230 (GAG/CVR), 2009 U.S. Dist. LEXIS 82508 (D.P.R. Sept. 10, 2009) ............... 32

*Skelton v. General Motors Corp.*,
860 F.2d 250 (7th Cir. 1988) ....................................................................... 14

*Spicer v. Chicago Bd. Options Exch.*,
844 F. Supp. 1226, (N.D. Ill. 1993) ............................................................... 20

*Steinfeld v. Discover Fin. Servs.*,
No. C 12-01118 (N.D. Cal. Mar. 10, 2014) ...................................................... 7, 16

*Steinhoff v. Star Tribune Media Co., LLC,*
No. 13-cv-1750, 2014 U.S. Dist. LEXIS 38293 (D. Minn. Mar. 24, 2014) ........................... 17

*Swedish Hosp. Corp. v. Shalala,*
1 F.3d 1261 (D.C. Cir. 1993) ...................................................................... 15

*Taubenfeld v. Aon Corp.,*
415 F.3d 597 (7th Cir. 2005) .................................................................. 10, 31

*Teamsters Local Union No. 604 v. Inter-Rail Transp., Inc.*,
No. 02-cv-1109, 2004 U.S. Dist. LEXIS 6363 (S.D. Ill. Mar. 19, 2004) ............................... 11

*Vollmer v. Selden,*
350 F.3d 656 (7th Cir. 2003) ...................................................................... 27

*Vought v. Bank of Am., N.A.,*
901 F. Supp. 2d 1071 (C.D. Ill. 2012) ............................................................ 19

*Warnick v. Dish Network Corp.*,
No. 11-cv-00615-MSK-CBS, Dkt. No. 14 (D. Colo. May 20, 2011) ................................. 7

*Wilkins v. HSBC Bank Nev., N.A.*,
Case No. 14-cv-190, Dkt. No. 75, (N.D. Ill.) ..................................................... 28

*Will v. General Dynamics Corp.*,
No. 06-698, 2010 U.S. Dist. LEXIS 123349 (Nov. 22, 2010)...................................... 14

1204670.6

*Williams v. Gen. Elec. Capital Auto Lease,*
No. 94 C 7410, 1995 U.S. Dist. LEXIS 19179 (N.D. Ill. Dec. 20, 1995) ............................... 16

## **RULES**

Rule 23(h) ...................................................................................................................... 19

## **TREATISES**

2 McLaughlin on Class Actions § 6:10 (10th ed. ................................................. 2, 18

Herbert Newberg, Attorney Fee Awards § 2.16 (1986)............................................ 20

Newberg on Class Actions
§ 14:6 (4th Ed. 2002) ............................................................................................... 14

Paul Karlsgodt, Notes From the 15th Annual National Institute on Class Actions (Oct. 17,
2011) ...................................................................................................................... 29

## **OTHER AUTHORITIES**

Michael O'Rielly, FCC Commissioner, <u>TCPA: It is Time to Provide Clarity</u>, FCC Blog
(Mar. 25, 2014) ...................................................................................................... 5

1204670.6

## I.    <u>INTRODUCTION</u>

Plaintiffs and Class Counsel are proud of the proposed Class Settlement.  It is comprised of (1) payment by Defendants[1] of $75,455,098.74 in cash into a non-reversionary Settlement Fund, the net proceeds of which will, upon Court approval, be distributed *pro rata* to more than 1.25 million claimants who have already filed claims—no money will revert back to Defendants—and (2) core changes to Defendants' practices as they relate to how they call Class members to ensure compliance with the TCPA.  It is the product of several years of disputed litigation and discovery efforts and hard-fought settlement negotiations, including multiple mediations before the Honorable Edward A. Infante (Ret.), and was informed by Class Counsel's years of experience litigating and resolving similar cases against other defendants. Plaintiffs and Class Counsel respectfully submit that this Settlement is a great result, particularly in light of serious litigation risks, and as evidenced by the overwhelmingly positive response of the Class to it.  As addressed below, this all-cash, non-reversionary settlement bears none of the "danger signs" flagged by the Seventh Circuit as potentially warranting concern.

While more than 1.25 million Class Members to date have submitted claims to recover under the Settlement, only fourteen (14) timely objected (6 were untimely), and another 457 opted out.[2]  Such infinitesimal numbers, representing only 0.000001% of the Class, demonstrates that the overwhelming majority of Class Members approve of the Settlement, a fact strongly supporting a finding that the Settlement is fair, reasonable, and adequate.  Moreover, a number of the objectors are represented by counsel known to be "professional" objectors. These

---

[1] The settling Defendants are Capital One Bank (USA), N.A., Capital One, N.A., Capital One Financial Corporation, Capital One Services, LLC, Capital One Services II, LLC  (together, "Capital One") and Capital Management Services, LP ("CMS"); Leading Edge Recovery Solutions, LLC ("Leading Edge"); and AllianceOne Receivables Management, Inc. ("AllianceOne") (collectively, the "Participating Vendors," and together with Capital One, the "Defendants").

[2] Declaration of Orran Brown Concerning Claims, Opt-Outs, and Objections ("Brown Decl."), ¶ 26-27.  For the purpose of this Response, Plaintiffs treat the one *timely* objection that was not filed with the Court—as required by the Settlement Agreement—as a valid objection.  Plaintiffs provide the Court herewith the previously unfiled objection of Paul M. Fortin, as Exhibit A to the Declaration of Jonathan D. Selbin in Support of Final Approval ("Selbin Decl.").

professional objectors make boilerplate objections that do not apply to *this* Settlement, and ignore the fact that Class Counsel's work obtained an excellent result for the Class despite the very real risks of facing an adverse ruling at class certification or on the merits that would have resulted in no recovery or recovery limited to only some few individuals. The remaining objectors fail to state any valid reason for declining to approve the Settlement as fair, reasonable, and adequate.

Plaintiffs respectfully submit that each objection should be overruled and request that the Court grant final approval of the Settlement.

## II. The Overwhelmingly Positive Response to the Settlement Supports Final Approval.

Class Members' reaction to a proposed settlement is a factor in determining whether the settlement is fair, adequate, and reasonable. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996). Ignoring this Seventh Circuit law, Jeffrey T. Collins argues that this Court should make no positive inference from the exceptionally low opposition to this Settlement (*see* Dkt. No. 197 at 14). To the contrary, courts typically infer that a settlement is fair, adequate, and reasonable because few class members object to it. *See, e.g., Isby* 75 F.3d at 1200 (affirming final approval of settlement where 13% of the class submitted written objections); *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *21 (N.D. Ill. Dec. 6, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement"); *Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560, 584 (N.D. Ill. 2011) (affirming approval of far smaller TCPA settlement than in this action where 342 class members excluded themselves and 15 class members objected) (citing *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections is strong circumstantial evidence in favor of the settlement"), *aff'd.*, 267 F.3d 743 (7th Cir. 2001)); *see also* 2 McLaughlin on Class Actions § 6:10 (10th ed.) ("Courts have generally assumed that 'silence constitutes tacit consent to the agreement,' so that the absence of objectors or receipt of a relatively small number of objections and opt-outs supports the conclusion that the settlement is adequate.") (citation omitted).

- 2 -

Here, Class Members' response has been overwhelmingly positive. Class Members have "voted with their feet," and in large numbers: over 1.25 million have already filed claims, with the deadline a week away. By contrast, only fourteen timely and validly objected, representing approximately 0.000001% of the Class. (Brown Decl., ¶¶ 27, 30 & Attach. 13.) Another 457 Class Members timely opted out, representing approximately 0.000003% of the known Class. (Brown Decl., ¶ 26 & Attach. 11.)

These de minimis numbers are particularly compelling evidence that the Class supports this Settlement, especially in light of two factors not always present in class settlements. First, there was a superb, state-of-the-art class notice program—upon which Class Counsel insisted— that included direct individual notice to more than 96% of the known Class (supplemented by, but not reliant upon, publication notice). (Brown Decl., ¶¶ 10-25, 30 [summarizing notice program].) In addition, Class Counsel paid for reminder emails to be sent to some 10.3 million Class Members about the impending claims deadline (the cost of which Class Counsel do not seek to recover). (*See id.,* ¶ 19.) Second, unlike in many class cases, the Court need not speculate about future claims rates or whether few objections or opt outs signify nothing more than a poor notice program or lack of Class Member interest. Those questions have been answered here, in droves, as more than 1.25 million Class Members have already made claims, and the deadline is not until November 26, 2014. (*See id.,* ¶ 36.)

## III. The Objections Lack Substantive Merit and Should be Overruled.

### A. The $75,455,098.74 Settlement Fund, Coupled with the Practice Changes, is an Excellent Result for Class Members.

The monetary relief in this Settlement is not "hypothetical" or "speculative," or based on an attempt to monetize coupon redemption rates or other inchoate relief. It is a "true" common fund, comprised of $75,455,094.74 in non-reversionary cash that will be distributed (net of fees and costs) to claiming Class Members.[3]

---

[3] In the event of uncashed checks, there will be multiple distributions to claiming Class Members so long as the amount per claimant is $1 or more. Then, and only then, will any remainder be distributed *cy pres*. (Agreement § 7.04(f).)

Some objectors argue—generically—that Class Members are not receiving enough money.[4] These objectors complain that more money should have been obtained, without acknowledging the substantial risks involved in the litigation and potential for years of delay. It is well-established, however, that since "the essence of settlement is compromise . . . courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (quoting *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) and *Bayh*, 75 F.3d at 1200) (internal quotations omitted).; s*ee also Armstrong v. Bd. of School Dirs.,* 616 F.2d 305, 315 (7th Cir. 1980) ("Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel."); *Fifth Third Bank,* 805 F. Supp. 2d at 584 ("[S]imply because the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair.") (quotations and citation omitted).

Plaintiffs acknowledge that the plain terms of the TCPA allow for statutory damages of $500 per call ($1,500 for willful violations), but attempting to obtain anything approaching that amount for all Class Members on the merits would entail significant risk and delay. First, Class Members face the factual defense of consent, as Capital One argues—with some force—that many Class Members provided their cell phone numbers to it either on credit applications or through subsequent dealings with Capital One or the Participating Vendors. To recover the full statutory damages, Plaintiffs would need to convince the Court to adopt their view that the FCC has clarified that "prior express consent" can only being given during "the transaction that resulted in the debt owed"; *i.e.* during the opening of Class Members' Capital One accounts. The Court could instead have adopted Capital One's view that consent may be given at any time

---

[4] *See* Dkt. No. 144, Objection of Bradley D. Rogers; Dkt. No. 152, Objection of Lisa Ann Pacheso; Objection of Tim Fortin (*see* Selbin Decl. Ex. A); Dkt. No. 184, Objection of Taylor Jane David; Dkt. Nos. 189, 190, 193, Objection of Maritza Cabrera; Dkt. No. 196, Objection of Antonia Carrasco; Dkt. No. 202, Objection of Vanessa VanWieren; Dkt No. 225, Objection of Simi Yasamine Faqiri.

and in any manner. If the Court adopted Capital One's view, Class Members would also face a potential class certification problem.

Courts are divided as to whether such consent issues predominate over common questions in TCPA cases, depending on the circumstances of the case. *Chapman v. First Index, Inc.*, No. 09 C 5555, 2014 U.S. Dist. LEXIS 27556, at *6-7 (N.D. Ill. March 4, 2014) (citing cases); s*ee also Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, at *49 (N.D. Ill. Jan. 4, 2013) (granting class certification); *G.M. Sign, Inc. v. Brinks Manufacturing Company*, No. 09 C 5528, 2011 U.S. Dist. LEXIS 7084, at *7-10 (N.D. Ill. March 4, 2014) (denying class certification). Moreover, the FCC is currently considering multiple petitions regarding the meaning of "consent" under the TCPA, and could issue rulings at any time which might undermine Plaintiffs' interpretation. *See, e.g., Higginbotham v. Hollins*, No. 14-cv-2087, 2014 U.S. Dist. LEXIS 85584 (D. Kan. June 24, 2014) (staying litigation pending FCC's consideration of and rulings on TCPA petitions and citing cases granting similar stays). *See also* Michael O'Rielly, FCC Commissioner, <u>TCPA: It is Time to Provide Clarity</u>, FCC Blog (Mar. 25, 2014) (*available at* http://www.fcc.gov/blog/tcpa-it-time-provide-clarity) (asserting that "the FCC needs to address this inventory of petitions as soon as possible" as it has the "opportunity to answer important questions and much needed guidance on a variety of TCPA issues, including . . . whether consent can be inferred from consumer behavior or social norms . . . .").

Moreover, even if Plaintiffs prevailed on that issue, Capital One maintains that it actually obtained prior express consent so defined to call its customers through the Capital One Customer Agreement. For example, one Agreement in effect during the Class period states: "[w]hen you give us or we obtain your mobile telephone number, we may contact you at this number using an Autodialer."[5] Plaintiffs believe that this language does not provide prior express consent for numerous reasons, including that it does not provide permission to contact a customer in

---

[5] *See* http://www.capitalone.com/media/doc/credit-cards/consumer-cards.pdf (last visited November 10, 2014).

violation of the TCPA, but recognize that this language presented a case-dispositive risk for members of the Class that were or are Capital One customers.  Capital One argues that this language goes beyond the requirements of the TCPA, and that it constitutes express, written consent to auto-dial customers, who agreed to be bound by the terms in exchange for using their Capital One credit cards.   That language provided a clear—and case dispositive—risk that this Settlement avoids.

Furthermore, at least some courts view awards of aggregate, statutory damages with skepticism and either refuse to certify a class or reduce such awards—even after a plaintiff has prevailed on the merits—on due process grounds.  *See, e.g., Aliano v. Joe Caputo & Sons - Algonquin, Inc.,* No. 09 C 910, 2011 U.S. Dist. LEXIS 48323, at *13 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case — between $100 and $1,000 per violation — would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature.").

As serial objector counsel Darrell Palmer learned first-hand, TCPA violations are not easy to prove on the merits, particularly on a class basis.  After unsuccessfully objecting to the TCPA settlement in *Arthur v. Sallie Mae, Inc.*, No. 2:10-cv-00198-JLR (W.D. Wash.), Mr. Palmer went on to bring his own unsuccessful TCPA actions, including one brought on behalf of the objector, Judith Harper, who he represented in the *Sallie Mae* case.  Each of these actions was dismissed or compelled to arbitration, thereby providing *no* monetary recovery for Mr. Palmer's clients or the classes they purported to represent.  *See, e.g., Harper v. Credit Control Servs.*, 863 F. Supp. 2d 125, 127 (D. Mass. 2012) ("Because it would not be reasonable for a jury to conclude from the record that CCS placed calls to Harper's cell phone in violation of the TCPA, defendant's motion for summary judgment will be allowed."); *Gonzalez v. Citigroup, Inc.*, No. Civ. S-11-0795 LKK/GGH, 2011 U.S. Dist. LEXIS 135421, at *8 (compelling claims to arbitration); *Gonzalez v. J.C. Penney Co., Inc.*, No. 2:11-cv-00794-KJM-EFB, Dkt. No. 18 (E.D. Cal. Sept. 21, 2011) (dismiss all claims with prejudice and imposing sanctions on plaintiff

for failure to comply with a prior court order); *Salina v. NCO Fin. Syst., Inc.*, No. 10-7496, Dkt. No. 44 (E.D. Pa. June 25, 2012) (voluntarily dismissing class action case without having obtained a recovery for the class); *Warnick v. Dish Network Corp.*, No. 11-cv-00615-MSK-CBS, Dkt. No. 14 (D. Colo. May 20, 2011) (same); *Gonzalez v. JP Morgan Chase*, No. 11-cv-00796-GEB-EFB, Dkt. No. 30 (E.D. Cal. Nov. 16, 2011) (same).

Although the claims deadline has not yet passed, 1,284,834 Class Members have made claims thus far. (Brown Decl., ¶ 35.) Assuming another 68,000 make claims (as BrownGreer does) before the November 26, 2014 deadline (for a total or approximately 1,352,000 claims), Class Members stand to receive between approximately $35.35 and 37.24 each. (*Id.*, ¶¶ 36, 38.) Accordingly, the Settlement is in line with other TCPA settlements, including those upon which VanWieren relies; indeed, the only reason the pro rata payment to class members is slightly less than certain cases VanWieren cites is because of the extraordinary participation levels caused by the excellent notice and claims administration program here. *See* Dkt. No. 75 at 1 (citing TCPA class settlements awarding between $85 and $100 each); s*ee also Rose v. Bank of America Corp.*, No. 11-cv-02390, Dkt. No. 86-1 at ¶ 7 (N.D. Cal. Apr. 1, 2014) (payments estimated to be between $20 and $40; actual payments between $55 and $60 for each claimant who received credit card or mortgage calls); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118, Dkt. No. 96 at ¶ 6 (N.D. Cal. Mar. 10, 2014) (payments estimated to be between $20 and $40; actual payments were $46.98); *Adams v. AllianceOne Receivables Mgmt., Inc*., No. 3:08-cv-00248-JAH-WVG, Dkt. No. 137 (S.D. Cal. Sept. 28, 2012) (class members received $40 each).[6] The

---

[6] VanWieren cites to several TCPA cases with higher pro rata payments (*see* Dkt. No. 202 at 3-4), but these actions share little in common with the underlying facts or relevant legal issues of this case, in which Defendants are alleged to have violated the TCPA when attempting to collect on credit card debt from tens of millions of people (primarily current or former Capital One customers). *Kramer v. Autobytel Inc., et al.*, 2:11-cv-05935-PSG-AGR (N.D. Cal.) is a text messaging case, in which Defendant Steve Madden Ltd. was alleged to have sent marketing texts in violation of the TCPA to approximately 200,000 consumers. *See id.*, Dkt. No. 56 at 1-3 (motion for final approval of class action settlement). *Malta v. Fed. Home Loan Mortg. Corp.*, 10-CV-1290-BEN (S.D. Cal.) involved allegations in connection with Wells Fargo's servicing and collection of auto loan and residential mortgage loans for an estimated class of 4,546,293. *Id.*, Dkt. No. 60 at 1-2, 7-9. In that action, only 114,713 valid claims had been received at time the of the filing of the motion for final approval (*see id.* at 5), which constitutes a far lower claims rate (approximately 2.5%) than in this action.

comprehensive and sophisticated notice program resulted in a rate of participation that exceeds that of other TCPA settlements. (Brown Decl., ¶ 35.)

Thus, objectors' subjective and speculative belief that this case could have settled for more money is without merit. And, critically, to the extent any Class Member decided that the payout was insufficient, he or she could simply opt out and pursue individual cases. That is particularly compelling here, where direct individual notice reach over 96% of the Class and included express language detailing both the expected payout under the Settlement and the relief available under the TCPA.[7] That so few Class Members exercised this option is telling. (Brown Decl., ¶ 26 & Attach. 11.)

**B.** **Basing Class Members' Awards on the Precise Number of Calls Received Was Not Feasible.**

Some objectors[8] argue that Class Members should be able to make a claim under the Settlement for each call received. Determining the number of calls made to each individual Class Member and then determining whether, when, and in what manner those individuals may have provided Defendants with consent to make such calls would not only be difficult but extremely costly, so much so that the process would consume a significant portion of the recovery simply on that administrative function. (Selbin Decl. ¶ 38.) Moreover, all of the calls at issue were debt collection calls; because each Defendant followed uniform procedures for making such calls, it is unlikely that a material portion of the class had an average call volume greater or lesser than any other class member.[9] The parties therefore concluded that allocating such relief regardless of the number of calls each Class Member may have received is reasonable, fair, and efficient. It is also in keeping with the structure of numerous other TCPA settlements.

---

[7] *See, e.g.*, https://capitalonetcpaclasssettlement.com/Documents/Long_Form_Notice.pdf

[8] Included among these objectors is Antonia Carrasco, who also objected to the HSBC TCPA settlement before this Court. *See Wilkins v. HSBC Bank Nev., N.A.*, Case No. 14-cv-190, Dkt. No. 72, (N.D. Ill.). There, Carrasco is represented by Cristopher Bandas, a professional objector who files objections to extract cash settlements in exchange for withdrawing objections on appeal. *See id.*, Dkt. No. 82.

[9] To the extent any Class Members did, they are of course free to opt out to pursue individual litigation. As the Court is aware, a small number have done so.

The Settlement Agreement affords all potential Class Members the opportunity to make a claim for monetary relief, and on the same terms.

**C.      The Requested Attorney Fee Award is Well-Supported Under Established Law.**

Most of the objections focus on the amount of attorneys' fees requested.  None of these objections has merit, and several of them appear uninformed about the separate litigation that was undertaken by the Plaintiffs prior to their transfer to the Northern District of Illinois by the Judicial Panel on Multidistrict Litigation.  Moreover, the Court's approval of the Settlement is not contingent upon its approval of fees in the amount requested, and therefore should not hold up final approval.

**1.      Class Counsel's Fee Request Comports with the Seventh Circuit's Market Approach**

With this brief, Plaintiffs are submitting the expert opinions of two leading and esteemed academics in the field of fee jurisprudence, Professors Brian Fitzpatrick and David Rosenberg, addressing why Class Counsel's requested fees here are appropriate under the Seventh Circuit's market approach, and why awarding fees based on counsel's lodestar or undertaking a lodestar "crosscheck" is inherently antithetical to that approach.

Professor Fitzpatrick is a Professor of Law at Vanderbilt University and the author of an article published in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010).  This article is the most comprehensive examination of federal class action settlements and attorneys' fees ever published and has been widely-cited by a number of courts, scholars, and testifying experts, as well as several of the objectors in this case.  In sum, Professor Fitzpatrick opines that (1) the percentage method, and not the lodestar method, best approximates the market for legal services, as contingency fee arrangements are typically chosen where, as here, it would be difficult for the plaintiffs to closely monitor the work of their attorneys as it aligns their interests with those of their attorneys; (2) the lodestar "crosscheck" is antithetical to the Seventh Circuit's market-based approach because such a crosscheck may discourage plaintiffs' attorneys from obtaining the best

- 9 -

recovery from the defendants; (3) the fee Class Counsel request here is consistent with the market for legal services in TCPA cases and this District; and (4) the fee should be calculated as a percentage of the entire common fund rather than only a part of it, because obtaining money for settlement administrative costs has a deterrent effect on defendants.

Professor Rosenberg is the Lee S. Kreindler Professor of law and Harvard Law School. He was an early proponent of, and contributor to, modern legal scholarship focusing on a functional approach to the law, sometimes known as "Law and Economics." In sum, Professor Rosenberg opines that in cases such as this involving a non-reversionary cash fund, the percentage method is far superior to the lodestar method, either alone or as a cross-check, for purposes of evaluating ex ante what a reasonable fee would be. In particular, the percentage method promotes social welfare by deterring violations of the law, incentivizes optimal investment in maximizing class recovery, and minimizes social costs for the class members, counsel, and the court.

### 2. 30% of the Common Fund is *Less* Than the Typical Market Price in the Seventh Circuit.

Several objectors argue that an award based on 30% of the common fund is too high. But, as detailed in Class Counsel's Motion for Attorneys' Fees, a fee based on 30% of a common fund is ***less than*** the attorney fee of one-third of the common fund plus expenses that is typically awarded in TCPA class actions in this district. *See* Dkt. No. 176 at 13-14 (citing multiple cases); s*ee also Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598, 600 (7th Cir. 2005) (approving lower court's consideration of "thirteen cases in the Northern District of Illinois where counsel was awarded fees amounting to 30-39% of the settlement fund" and affirming its award of "30% of the settlement fund plus $111,054.06 in expenses").[10] Moreover, objectors ignore the fact that

---

[10] This Court also recently finally approved a settlement in *Harris v. Comscore, Inc.* (Dkt. No. 369), awarding 33% of the common fund in attorneys' fees, and holding "that the payment of $4,662,000 [in attorneys' fees] is fair and reasonable as the market price for legal services based on a hypothetical ex ante bargain between the Settlement Class and Class Counsel." (Selbin Decl. Ex. L at 5-6.)

Class Counsel do *not* seek reimbursement of their costs on top of this fund, and thus the amount requested in fees is actually *less* than 30%.

While acknowledging that the Seventh Circuit determines fees in common fund cases by looking at fees negotiated and awarded in the market, VanWieren asserts that Class Counsel's retainer agreements with Plaintiffs—which call for a fee of between 33.33% and 40%, up to a third, or which do not mention a specific percentage (*see* Dkt. No. 176 at 9)—may not be considered dispositive in supporting Class Counsel's fee request. This is erroneous. Under the Seventh Circuit's market approach, "[t]he first benchmark is actual agreements." *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 719 (7th Cir. 2001). *See also Pavlik v. FDIC,* No. 10 C 816, 2011 U.S. Dist. LEXIS 126016, at *11 (N.D. Ill. Nov. 1, 2011) ("Based on the actual contingency fee agreements Plaintiffs' counsel signed with the two named plaintiffs, as well as the market data for fees in cases of this size, the Court finds that Plaintiffs' counsel are entitled to attorneys fees in the amount of 33 1/3% of the common fund."); *Teamsters Local Union No. 604 v. Inter-Rail Transp., Inc*., No. 02-cv-1109, 2004 U.S. Dist. LEXIS 6363, at *2 (S.D. Ill. Mar. 19, 2004) (acknowledging that the "first" benchmark "is the actual agreements negotiated by the named Plaintiffs and the Class Counsel prior to commencement of the litigation" and awarding 33 1/3% of the common fund).

Several objectors argue that this Court should apply an award that is approximately 20% of the common fund, based on the "sliding scale" articulated in *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*"), but *Synthroid II* does not mandate such an approach, which makes little sense in this action.[11] Indeed, at least one other district court within the Seventh Circuit has held that an objector—represented by objector Nykaza's counsel (John Pentz) –showed "bad faith and vexatious conduct by insisting upon arguments that mischaracterize and misapply Seventh Circuit case law" when he argued that "the Court was required to apply the mandatory sliding scale fee structure discussed in *In re Synthroid Marketing Litig.*, 325 F.3d 974

---

[11] *See* Dkt. No. 197 at 5-10 (Collins objection)); Dkt. No. 195 at 2-5 (NyKaza objection); Dkt. No. 202 at 9-12 (VanWieren objection).

(7th Cir. 2003)." *Heekin v. Anthem, Inc.*, No. 1:05-cv-01908, 2013 U.S. Dist. LEXIS 26700, at *10 (S.D. Ind. Feb. 27, 2013) ("While a sliding scale fee structure was applied in that case, it was not made mandatory for all class action cases.").

A sliding scale may—in theory—indicate the prevailing market rate in a particular case, as in *Synthroid II* based on the unique facts of that case (discussed below). But it does not here, where the parties and courts in this district have clearly established a market rate of 33% of the common fund for TCPA actions, as also reflected in the retainer agreements signed by Plaintiffs. *See* Dkt. No. 176 at 9, 13-14. This same rate is also consistently reflected in non-TCPA actions. *See id.* at 14-15. Indeed, as detailed in Professor Fitzpatrick's comprehensive analysis of class action cases in the Seventh Circuit, the *ex ante* market rate is at least 30%. Fitzpatrick Decl. ¶¶ 12-13.

The objectors' attempts to rotely graft the *Synthroid II* recovery tiers[12] onto this action ignore the case-specific and fact-based reason those tiers applied there: they best reflected the market rates *in that action* as demonstrated by retainer agreements entered into by sophisticated clients, third-party payors ("TPPs"), in a part of the case distinct from the consumer case. Determining the market rate for the TPP's counsel's fee award of 22% was "simple," because the TPPs' "attorneys and clients set it themselves through arms'-length negotiations." *See Synthroid II*, 325 F.3d at 976. The consumer class counsel's work, in contrast, required a higher percentage of the recovery because of the greater risk born by the consumer class counsel (as compared to the TPPs' counsel). Judge Easterbrook therefore awarded: (1) a higher percentage (than awarded to the TPPs' counsel) on the first $20 million of recovery, (2) the same percentage (22%) recovered by TPPs' counsel on the next $26 million of recovery (through the $46 million amount recovered by TPPs' counsel), and (3) a lower amount on the remaining portion of the fund. *Id.* at 980. In *Synthroid II*, because the market rate for consumer class counsel was unknown and unclear, the Seventh Circuit (and the District Court below it) was forced to parse

---

[12] The Seventh Circuit awarded consumer class counsel 30% of the first $10 million, 25% of the next $10 million, 22% of the next $26 million, and 15% of the next 42 million. See *Synthroid II*, 325 F.3d at 980.

out the award in this manner.  It makes no sense here, however, where the ex ante market for legal services is known and established; the objectors' attempts to push for a *Synthroid II*-style approach here is therefore not well-taken.[13]

The objectors also cite to *Silverman v. Motorola Solutions, Inc.*, in which the Seventh Circuit affirmed a 27.5% award on a $200 million common fund.  *See* 739 F.3d 956 (7th Cir. 2013).  This case is unhelpful to the objectors, because even in *Silverman*, the Court declined to award tiered recovery, while opining on the possible benefits of such an approach in "megafund" cases.  *Id.* at 959.  In any case, the Seventh Circuit finds that even in "megafund" cases, which this is not, the court must award a percentage of the fund because any other method would "eliminate counsel's incentive to press for more . . . from the defendants."  *Synthroid I*, 264 F.3d at 719; *see also* Fitzpatrick Decl. ¶ 10.

In sum, Seventh Circuit law and the market price amply supports awarding 30% of the fund as attorneys' fees.[14]

### 3.     A Lodestar Crosscheck is Not Required or Warranted.

Although this Court lifted the discovery stay to grant Collins access to limited discovery regarding Class Counsel's lodestar (Dkt. No. 209), Plaintiffs do not believe that a lodestar analysis or cross-check is necessary or proper in this Circuit in this true common fund case.  *See Beesley v. Int'l Paper Co.*, No. 06-cv-703, 2014 U.S. Dist. LEXIS 12037, at *10-11 (S.D. Ill. Jan 31, 2014) (citations omitted)*; Nolte v. Cigna Corp.*, No: 2:07-cv-2046, 2013 U.S. Dist. LEXIS 184622, at *11 (N.D. Ill. Oct. 15, 2013) ("The use of a lodestar cross-check has fallen into disfavor.") (citing *Synthroid II*, 325 F.3d at 979-80 ("The client cares about the outcome alone" and class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced."); *Fifth Third Bank*, 805 F. Supp. 2d at 598 n.27 (recognizing

---

[14] Collins not only argues that fee request is excessive but, with no evidence whatsoever, that the settlement contains "signs of self-dealing."  *See* Dkt. No. 197 at 3-4.  This is false and reveals a complete misunderstanding of the nature of this litigation, and in particular the mediations, where every key provision of the Settlement Agreement was carefully negotiated and disputed among the parties, all prior to any agreement on the amount of fees Class Counsel would seek. (Selbin Decl. ¶ 15.)

irrelevance of lodestar cross-check while nevertheless approving fee request with lodestar risk multiplier of 2.5); *Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *10 (Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive.")); *In re Comdisco Sec. Litig.,* 150 F. Supp. 2d 943, 948 n.10 (N.D. Ill. 2001) ("To view the matter through the lens of free market principles, [lodestar analysis] (with or without a multiplier) is truly unjustified as a matter of logical analysis.").[15] Accordingly, it is appropriate to award 30% of the fund as fees here without engaging in a lodestar cross-check.

Instead, the fairest and most efficient way to calculate a reasonable fee where, as here, contingency fee litigation has produced a non-reversionary cash fund is by awarding class counsel a percentage of the total fund.

There is an important policy reason behind choosing to apply the pure percentage-of-the-fund method, rather than the lodestar-crosscheck method, in common fund cases such as this one:

> Consider the following example. Suppose plaintiffs entered into a contract with their attorneys that said the attorneys would receive 30% of any recovery or three times the attorneys' lodestar, whichever is lesser. Under such an arrangement, attorneys are completely indifferent between settling a case for three times their lodestar and any amount greater than that. For example, once attorneys have incurred $1 million in lodestar, they would be completely indifferent between settling a case for $10 million and settling it for $30 million. As the Seventh Circuit explained with regard to the megafund practice, "[p]rivate parties would never contract for such an arrangement."

Fitzpatrick Decl. ¶ 11 (quoting *Synthroid I*, 264 F.3d at 718); *see also* Rosenberg Decl. at 7-8, 9-15, 16 ("Paying class counsel by the hour, as with any other lawyer, creates a risk, at best, of diluting incentives to invest optimally and efficiently, and, at worst, of outright fraudulent overbilling or churning."); Newberg on Class Actions § 14:6 (4th Ed. 2002). *See also Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996), *aff'd* 160 F.3d 361 (7th Cir. 1998) (explaining

---

[15] VanWieren's reliance on *Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) is misplaced, as class counsel there *asked* the court to award fees based on their lodestar. And, *Harman v. Lyphomed, Inc.,* 945 F.2d 969 (7th Cir. 1991) simply affirmed the district courts' discretion to use either the percentage-of-the-fund or the lodestar method in determining fees, although it found error in the lower court's refusal to apply a multiplier.

that "the percentage of the fund method provides a more effective way of determining whether the hours expended were reasonable" because "courts can expect attorneys to make cost-efficient decisions about whether certain expenses are worth the win"). In addition, the percentage-of-the-fund method comports with the legal marketplace, where counsel's success is frequently measured in terms of the results counsel has achieved. *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993) (in common fund cases "the monetary amount of the victory is often the true measure of [counsel's] success"). By assessing the amount of the fee in terms of the amount of the benefit conferred on the class, the percentage method "more accurately reflects the economics of litigation practice" which, "given the uncertainties and hazards of litigation, must necessarily be result-oriented." *Id.* at 1269. It also comports with the established practice in the private legal market to reward attorneys for taking the risk of nonpayment by paying them a premium for successfully resolving contingency fee cases. *See McDaniel v. Qwest Communs. Corp.,* No. 5 C 1008, 2011 U.S. Dist. LEXIS 154591, at *11 (N.D. Ill. Aug. 29, 2011) ("Risk cannot be overlooked, for it is considerable even in a relatively simple class case. As Judge Posner recognized, '[t]he lawyers for the class receive no fee if the suit fails.'") (quoting *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992)); *Martin v. Caterpillar Inc.,* No. 09-cv-1009, 2010 U.S. Dist. LEXIS 145111, at *5 (C.D. Ill. Sept. 10, 2010) ("As observed by the Seventh Circuit in *Gaskill v Gordon*, 160 F.3d 361 (7th Cir. 1998), 'it is common place to award the lawyers for the class a percentage of the fund in recognition of the fact that most suits for damages in this country are handled in the plaintiff's side on a contingency fee basis.'"). Finally, it saves the Court the time it would need to spend reviewing billing records. *Gaskill,* 942 F. Supp. at 386.

For these reasons, while courts in the Seventh Circuit have the discretion to elect either the percentage-of-the-fund or the lodestar methods in determining reasonable fees, the percentage-of-the-fund method is utilized far more often and is appropriate here. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.,* No. 09 C 7670; MDL 2103, 2011 U.S. Dist. LEXIS 157910, at *9 (N.D. Ill. Nov. 30, 2011) (Holderman, J.) (rejecting objector's request

to review billing hours, noting that "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class") (quoting *Williams v. Gen. Elec. Capital Auto Lease,* No. 94 C 7410, 1995 U.S. Dist. LEXIS 19179, at *29 (N.D. Ill. Dec. 20, 1995) (citations omitted)).

A few of the objectors point to the attorney fee order in *Rose v. Bank of Am. Corp.*, No. 11-cv-02390, Dkt. No. 108 (N.D. Cal. Aug. 29, 2014), in which Judge Davila reduced the requested fee of 25% of the fund (which is the Ninth Circuit benchmark) to less than 7.5% of the fund after applying a lodestar analysis. Respectfully, Class Counsel submit that this order represents a radical departure from the typical fees awarded in the Ninth Circuit for TCPA class action cases. *See, e.g., Steinfeld v. Discover Fin. Servs.,* No. C 12-01118, 2014 U.S. Dist. LEXIS 48540 (N.D. Cal. Mar. 31, 2014) (awarding the requested 25% of the fund). The order was also premised on several errors of fact, including: (1) the amount of *pro rata* payments class members would receive; (2) the different types of calls at issue and the different entities sued in each of the separate TCPA cases that were covered by the settlement; (3) the years-long separate efforts of counsel in litigating each separate case up until they ultimately coordinated their efforts in seeking a settlement; (4) the risks involved; and (5) the numbers of hours worked and the types of work performed by class counsel. For these reasons, the *Rose* order is the subject of a still-pending pending a motion for reconsideration, currently set for hearing on February 20, 2014. *Id.* at Dkt. No. 110 (attached as Exhibit G to the Selbin Decl.). Objectors provide no reasoned basis that would justify following that out-of-jurisdiction order based on (erroneous) facts specific to that case.

### 4.    The Risk Involved Supports the Fee Request.

VanWieren characterizes this as an "easy" case (*see* Dkt. No. 202 at 12), notwithstanding her counsel's own failures in prosecuting TCPA class actions as detailed above, and Collins maintains that Class counsel did not have "a difficult road" (Dkt. No. 197 at 7-10). Unfortunately, Class Counsel's own history reveals that TCPA class actions are by no means a "sure thing": they, too, have litigated and lost a number of TCPA cases without prevailing for the

class and without obtaining a single penny in fees.[16]  VanWieren's and Collins' arguments are therefore unfounded, and the risk of undertaking this action supports the fee request.[17]

**5.  It is Appropriate to Include Administrative Costs as Part of the Fund when Calculating Attorneys' Fees.**

As explained in Class Counsel's Memorandum in Support of Motion for Attorneys' Fees (Dkt. No. 176), it is appropriate—and the norm in the Seventh Circuit—to include administrative and notice costs when calculating fees based on a percentage-of-the-fund.  *See In re Fesco Plastics Corp.,* 996 F.2d 152, 157 (7th Cir. 1993) (the common fund doctrine "holds that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole") (quoting *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980)); *In re Ky. Grilled Chicken Coupon Mktg. & Sales Practices Litig.,* 2011 U.S. Dist. LEXIS 157910, at *17 ("Because the costs of class action litigation necessarily include the costs of notice, administration of the settlement fund, incentive awards, and attorneys' fees, and because the settling defendants in these types of lawsuits have agreed to pay these costs in exchange for release of [their] liability, the court finds that such costs are reasonably viewed as having been paid for the benefit of the class.") (quotations and citation

_____

[16] *See, e.g., Hudson v. Sharp Healthcare,* No. 13-cv-1807, Dkt. No. 56 (S.D. Cal. June 25, 2014) (granting summary judgment against Plaintiff in TCPA class case); *Elkins v. Medco Health Solutions, Inc.,* No. 12-cv-2141, 2014 U.S. Dist. LEXIS 57633 (E.D. Mo. Apr. 25, 2014) (same); *Martin v. Wells Fargo Bank, N.A.,* 12-cv-06030, Dkt. No. 94 (N.D. Cal. Apr. 4, 2014) (dismissing case with prejudice); *Steinhoff v. Star Tribune Media Co., LLC,* No. 13-cv-1750, 2014 U.S. Dist. LEXIS 38293 (D. Minn. Mar. 24, 2014) (granting defendant's motion for judgment on the pleadings on the issues of prior express consent); *Evans v. Aetna Inc.,* No. 13-cv-01039 (E.D. Wisc. Nov. 20, 2013) (dismissing case), *Brown v. DIRECTV, LLC,* No. 12-cv-08382, 2013 U.S. Dist. LEXIS 90894 (C.D. Cal. June 26, 2013) (compelling claims to arbitration on an individual basis); *Cayanan v. Citi Holdings, Inc.,* 928 F. Supp. 2d 1182, 1208 (S.D. Cal. 2013) (same); *Maleksaeedi v. Am. Express Centurion Bank,* No. 11-cv-790, Dkt. No. 32 (S.D. Cal., Feb. 12, 2013) (same); *Delgado v. US Bankcorp,* 12-cv-10313, Dkt. No. 12 (C.D. Cal. Jan. 17, 2013) (dismissing case); *Moore v. Chase Bank USA, N.A.,* No. 12-cv-10316, Dkt. No. 10 (C.D. Cal. Jan. 9, 2013) (dismissing case); *Greene v. DirecTV, Inc.,* No. 10-C-117, 2010 U.S. Dist. LEXIS 118270 (N.D. Ill. Nov. 8, 2010) (granting summary judgment against Plaintiff ).
[17] Class Counsel outlined the risk undertaken in this case in their memorandum in support of attorneys' fees and service awards (Dkt. No. 176), and above in Section IV. A.  Collins' objection, in particular, includes numerous factual inaccuracies, including that there were no dispositive motions in this action: in fact, plaintiffs survived multiple dispositive motions before this action was transferred to the Northern District of Illinois by the Judicial Panel on Multidistrict Litigation ("JPML").

omitted); *see also* 2 McLaughlin on Class Actions § 6:24 (10th ed.) ("Where the defendant agrees to pay the reasonable cost of notice to the class, courts will include that cost, as well as the cost of claims administration, in calculating the common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees.")

Courts not only construe administrative and notice costs as a benefit to the class in common fund cases, but also include those costs when calculating attorneys' fees because it encourages class counsel to obtain the most effective notice and claims administration plan possible. *See In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1078 (S.D. Tex. 2012) (including $1.5 million cost of implementing the notice program when calculating attorneys' fees because "[i]ncluding the notice costs in the value helps ensure that counsel work to make the notice effective and that such settlements are public and that damages are pursued."). Put another way, failure to include notice and claims administration costs when calculating attorneys' fees provides perverse incentives for Class Counsel to negotiate the least expensive and user-friendly notice and claims programs to keep the cost down so as to ensure more money for fees.

Nothing in *Redman v. Radioshack Corp.*, No. 14-1470, 2014 U.S. App. LEXIS 18181 (7th Cir. Sept. 19, 2014) undermines this principle, as its facts are wholly inapposite. Unlike a true "common fund" case like this one, *Redman* involved a coupon settlement where the "fund" had to be monetized from coupon redemptions, and the fees were subject to CAFA's coupon-specific requirement that attorneys' fees be paid in relation to the total amount of coupons redeemed. Unlike *Redman*, Class Members here will receive *pro rata* cash payments from a non-reversionary cash fund. In addition, the notice here reached more than twice the percentage of class members at about half the cost compared to the notice program in *Redman*. Thus, an award of 30% of the entire settlement fund is warranted, and the objections premised on this ground should be overruled.

6. **The Presence of a "Clear Sailing" Clause Does Not Warrant Reducing the Fee Award.**

Some objectors argue, again citing *Redman*, that the presence of a "clear sailing clause"—in which a defendant agrees not to contest class counsel's motion for attorneys' fees—warrants heightened scrutiny and/or reduction of the fee. But, *Redman* is clear that the potential problems with clear sailing clauses arise in situations where, unlike here, "the value of the settlement to the class members is uncertain because it is not a cash settlement." *Redman*, 2014 U.S. App. LEXIS 18181, at *37. Such clauses are also problematic where, unlike here, the settlement fund is *reversionary*. *See Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071, 1100 (C.D. Ill. 2012) (noting that "[t]he combination of a reversionary fund settlement and a clear sailing clause has given [] courts reason to pause"). Because any dollar that does not go to the class would go to the defendant in the case of a reversionary settlement, a clear sailing clause could give rise to collusion between the defendant and class counsel at the expense of the class. But here, the amount of the Settlement fund is certain and is non-reversionary, and thus the concerns with clear sailing clauses do not apply. *See also Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (questioning settlement provision permitting settlement funds not allocated to attorneys' fees to revert to Defendant).

Moreover, these objections also ignore the very structure of this settlement. Specifically, only after Class counsel secured a common settlement fund of over $75 million and the parties agreed on all material terms of the settlement did the parties discuss Class counsel's fees. (Selbin Decl. ¶ 15.) Thus, under these circumstances, there is no risk whatsoever that the clear sailing provision impacted the size of the settlement fund.

7. **Class Counsel Need Not Identify How Attorneys' Fees Will Be Allocated Among The Various Firms Serving As Class Counsel.**

Collins maintains that Class Counsel's fee request violates Rule 23(h) for failing to identify "how the attorney fee will be allocated among different class counsel." (*See* Dkt. No. 197 at 12-13). Nothing in Rule 23(h) nor the Advisory Committee Notes thereto says anything about fee allocation among class counsel. Collins also cites no Seventh Circuit law for this

proposition, because that is not the law in this Circuit.[18]  *See Spicer v. Chicago Bd. Options Exch.*, 844 F. Supp. 1226, (N.D. Ill. 1993) ("Ideally, allocation of the fee award is a private matter to be handled among class counsel. Herbert Newberg, Attorney Fee Awards § 2.16 (1986). . . . Accordingly, we will not order a specific allocation of our award among the firms. Should the firms require such an order, they have ten days in which to petition this court to make such an allocation."); 1 Attorneys' Fees § 7:10 (3d ed.) (same); *see also In re Diet Drugs Prods. Liab. Litig.,* 401 F.3d 143, 168 (3d Cir. 2005) (same) .  Despite Collins' claim that his objection is based only on Seventh Circuit law (*see* Dkt. No. 208 at 1 n.1 ("Mr. Collins's objection is based on Seventh Circuit law" and his objection in another TCPA matter was "based on materially different Ninth Circuit law"), he cites only two cases, one from the Ninth and one from the Fifth Circuits.  Nonetheless, neither case mandates that the Court review or approve the allocation of fees among class counsel.  *See Mercury Interactive Corp. Sec. Litig.,* 618 F.3d 988, 994 (9th Cir. 2010) (noting that the Court acts as a fiduciary for the class when awarding attorneys' fees but not requiring (or even discussing) the allocation of attorneys' fees among plaintiffs' counsel); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 223, 227 (5th Cir. 2008) (inquiring into the fee allocation among plaintiffs' counsel – some of whom objected to the allocation (as opposed to class members) – where the district court failed to properly supervise a five-member Fee Committee that distributed a $6.875 million lump sum among thirty-two law firms and seventy-nine plaintiffs' attorneys on behalf of the Court).

Class counsel do not routinely provide the Court with the fee allocation among the firms serving the class because it is not the law to do so, and because that information in no way serves the class.  Indeed, not only do courts rarely if ever address allocation (outside the context of a "fee fight" between counsel), most typically authorize lead counsel to allocate the fees in their discretion.[19]  Collins' argument should be disregarded.

---

[18] This is but one of many instances of Collins' counsel advocating that this Court take a new position contrary to Seventh Circuit law.
[19] *See, e.g., Arthur v. Sallie Mae, Inc.*, 2012 U.S. Dist. LEXIS 132061, at *8 (W.D. Wash. Sept. 17, 2012).

## D. The Notice Provided to the Class was Exemplary and State of the Art.

Class Members have until November 26, 2014 to submit claims, but as of the date of this filing, over 1.25 million Class Members have submitted claims forms, while just 457 persons have timely asked to be excluded and 14 have timely objected. (Brown Decl. ¶¶ 26, 27, & Attachment 13.) The rate of participation among class members exceeds the participation rate of similar consumer settlement programs. (Brown Decl. ¶ 35.) In short, the notice provided to the class was exceptional and state-of-the-art.

The Settlement administrator reached, via direct notice (emails and postcards), approximately 96.66% of the 16,645,221 known Class Members, which was supplemented by online publication notice: internet banner notices and a paid search component that increased traffic to the settlement website.[20] (Brown Decl. ¶¶ 8, 11, 24-25, 30.) Further, starting on November 7, 2014—at Class Counsel's expense—the Settlement Administrator sent a courtesy reminder to 10.3 million Settlement Class members who had not yet filed claims. (Brown Decl. ¶ 19.) The direct and publication notice provided Class Members with the following information: (1) the name of the case, parties, and a general description of the claim; (2) a description of the Class; (3) the total amount of the Settlement Fund; (4) the estimated amount of individual Class Member payments; (5) the requested attorneys' fees; (6) Class Members' rights to submit a claim, to opt-out out of the Settlement, to object to the Settlement, or to do nothing, and the consequences of exercising such rights; (7) the deadlines for taking such actions; (8) the final approval hearing date; and (9) where to get more information, including the URL for the Settlement Website and the number for the toll-free settlement hotline. *Id.*, Exs. 2-4.[21]

---

[20] Because the Parties estimate that approximately 5% of the Settlement Class is unknown to Capital One, the total estimated Settlement Class consists of 17,521,285 individuals. (Brown Decl. ¶ 11.) The combined email and postcard notice campaigns reached 91.83% of this estimated Settlement Class. (Brown Decl. ¶ 30.)

[21] Objector Millicent Hodge faults the mailed notice and the Settlement website's "Frequently Asked Question" section for failing to disclose the statutory penalties available under the TCPA. (*See* Dkt. No. 228.) The statutory penalties, however, are noted in the long-form notice approved by this Court which, in turn, is posted on the Settlement Website. (Brown Decl. ¶ 33.) Furthermore, the summary postcard notice cannot include all relevant information, and was carefully designed to provide the most important information to notify class members of the settlement and to permit class members to easily file claims. (Brown Decl. ¶ 21 & Attachment

Objector Stephen Kron argues that the claim form "may depress the claims rate" because claimants are required to provide the cellular telephone number that received an automated call from Capital One, which many Class Members may no longer use and remember. This is incorrect. The vast majority of claimants (97.6%) file claims online, over the phone, or by returning postcard claims forms and do not need to fill in the relevant cellular telephone number. (Brown Decl. ¶ 33.) Only a very small (2.4%) category of claimants (those filing their claim via the long-form form printed of the settlement website who do not know their cellular telephone number or Notice ID) could even face this issue by needing to fill in their cellular telephone number. (*Id.*) Where an individual does not remember or otherwise does not enter a cellular telephone number on a long-form claim form, the settlement administrator alerts that individual to the issue and provides 35 days to cure. (*Id.* ¶ 34.) To state the obvious, if a Class Member cannot recall or locate the relevant cell number, he or she would be equally hard put to win an individual case as to make a claim here.

Palmer and objector Tweed argue that the "Released Parties" named in the Settlement Agreement are too broad (*see* Dkt. No. 202 at 5-7; Dkt. No. 227 at 3-4), and that as a result certain Class Members may not have realized they are in the Class. This is nonsense. The release only includes calls made by Capital One and/or the specifically named Participating Vendors. Any Capital One vendors who chose not to participate in the settlement are not released. Any persons who received calls from such vendors are free to pursue claims against those vendors, if they choose. The language used in the release (Section 2.36) is commonplace and proper. Further, it is not overly broad because it includes "all entities with which Capital One contracts to obtain representatives to place calls using Capital One's dialer," because under

---

4.) Further, the summary postcard notice noted the settlement website address, where interested class member could find more detailed information on the long form notice, including the TCPA's statutory penalties. Hodge's request for discovery "by, for or between the parties" regarding the Notice issues discussed above should therefore be denied. The information sought by Hodge has no relevance as to whether the Settlement is fair, reasonable, and adequate, and seeks privileged communications.

Plaintiffs' reading of the TCPA, such entities would be held liable for calls made on behalf of Capital One.

As noted above, notice in this action was first-rate, and has been communicated to at least 96.66% of the known Class, who need not worry that the Notice does not clarify whether holders of "PlayStation and Sony credit cards" affiliated with Capital One are included. The Notice is not required to indicate every credit card that is jointly sponsored by Capital One and a retail merchant, but must provide adequate notice to Class Members who fall within the Class definition. In addition, Capital One customers are extremely unlikely to be unaware that these "partner" cards serviced by Capital One. (*See* Selbin Decl. ¶ 39.) On that front, the Notice is a resounding success. VanWieren's and Tweed's frivolous arguments about partnership cards have no bearing on the strength of the Notice.

Objector Collins maintains that the process for opting out and objecting was "unnecessarily onerous,"[22] citing to an out-of-district case in which opting out of the settlement required submitting an email and a first-class or hand-delivered exclusion form to both Plaintiffs' counsel and defense counsel. *See Galloway v. Kan. City Landsmen, LLC*, 4:11-1020, 2012 U.S. Dist. LEXIS 147148, at *16 (W.D. Mo. Oct. 12, 2012). Here, opting out only required one piece of mail that could be sent to the Settlement administrator in any form, as long as postmarked no later than October 27, 2014. (Brown Decl. ¶ 26.) This standard method of opting out is simple, efficient, and in no way "onerous." *See, e.g., Kitson v. Bank of Edwardsville & Harland Fin. Solutions, Inc.*, CIVIL NO. 08-507, 2009 U.S. Dist. LEXIS 85444, at *10 (S.D. Ill. Sept. 18, 2009) (preliminarily approving settlement – which was later finally approved – that required opt-out class members to mail opt-out notice to the claims administrator).

Finally, objector Devera D. Bartte objects that the Notice should have contained the number of Class Members, information included in the memorandum in support of class counsel's motion for attorneys' fees and service awards (*see* Dkt. No. 176 at 10) and included on

---

[22] Collins appears to have waived this objection by later stating that he "only objects to fees and *cy pres*." Dkt. No. 208 at 1 n.1.

the Settlement Website. This information has no bearing on whether a Class Member was properly notified of the Settlement and claims program so as to inform a decision on whether or not to participate. The Notice does, however, contain all necessary and relevant information to facilitate that choice, including, among other things, the total settlement fund value and the expected pro rata payout rate per Class Member. That it was effective in doing so is evidenced by the more than one million (and counting) claims filed.

**E.      The Remaining Objections Provide no Basis to Decline to Approve the Settlement.**

The remaining objections are equally without merit. Objector Vera principally wants the Court to award him more money in order to pay off his Capital One account balance (*see* Dkt. No. 157); other objectors have asked for more money as well, stating generally that the claim amount is insufficient. (*See* Dkt. Nos. 184, 189-90, 193, 211, 215.) Objector Rogers inveighs against "Capital One's debt collection scare tactics" and alleges that Capital One forced Mr. Rogers to sell his home "at a loss" (*see* Dkt. No. 144), activities that are unrelated to this action. None of these objections, which relate to individual circumstances not at issue in, or resolvable by, this litigation, undermines a finding that the Settlement is fair, reasonable, and adequate. Nor does objector Jolayemi, who objects that the consequences of the Settlement will "jeopardize the employment and lives of hundreds of Capital One workers," and argues that he has not been harmed by Capital One (*see* Dkt. No. 188), though he fails to exclude himself from the Class. (*See* Brown Decl. Attachment 13.)

**F.      The Business Practice Changes Provide a Great Benefit to the Class.**

Several objectors argue that there have been no meaningful practice changes (*see* Dkt. No 202 at 4-5; Dkt. No. 217; Dkt. No. 227 at 2-3), but this is flat-out wrong. As detailed in Class Counsel's Memorandum in Support of Motion Final Approval of the Class Action Settlement, Capital One has developed and implemented significant enhancements to its calling systems designed to prevent the calling of a cellular telephone with an autodialer unless the recipient of the call has provided prior express consent within the meaning Plaintiffs and Class Counsel—not

TCPA defendants—give it.  Agreement § 4.01.  The practice changes that Class counsel obtained are a tremendous result and will benefit every one of the millions of Class members, as well as other Capital One customers.

Specifically, Capital One has instituted a protocol under which it places calls to a cellular telephone number using its dialer(s) only where the cellular telephone number was provided on the customer's application for credit.  (Selbin Decl., ¶ 20.)  In other words, Capital One's practices are now consistent with Plaintiffs' interpretation of the FCC's 2008 Declaratory Ruling.  Therefore, under Capital One's protocol, it is not placing autodialed calls to consumers' cellular telephones unless it obtained prior express consent under the TCPA as Plaintiffs allege it must be construed.  (*Id.*)

In addition, effective July 1, 2014, Capital One has only been dialing such numbers (that were provided on a customer's credit application) if one of two additional conditions is also met, namely, either: (1) the cellular telephone number is specifically linked to the customer's name based on third party research; or (2) Capital One has made contact with the customer on the cellular telephone number within the past 90 days.  (*Id.* ¶ 21.)  In other words, Capital One is not relying solely on the fact that a number appears in a credit application for assurance that the number still belongs to one of its customers.  Recognizing that people sometimes change their cellular telephone numbers, this avoids the circumstance in which a Capital One customer enters a particular number on a credit application, then changes that number, and some different person takes that same number who is then autodialed by Capital One.  With this new protocol in place, Capital One has reduced the probability that it will make an automated call to someone with whom it has had no business dealings.  This business practice change, therefore, provides a great benefit.

Capital One has also improved its processes to stop calling a cellular telephone number if the called party requests.  In other words, every Class member who wants the automated calls to stop has the ability to make the calls stop.

Objector VanWieren (via her counsel Darrell VanWieren), argues that these changes are insufficient, because under this new regime consent is "inferred" from placing a cell phone number on "an application for credit" and that consumers cannot easily make unwanted calls stop;[23] this argument is mistaken for two independent reasons. First, as noted above, all parties agree that providing a cell phone number on the initial application for credit constitutes prior express consent under the TCPA. That is, no one (other than VanWieren, apparently) contends the law Congress enacted means anything *less* than this. Capital One will comply with that law moving forward when it limits use if its dialers to cell numbers provided to Capital One in that manner. This is a meaningful change. Second, as described above, Capital One will also ensure that the cell number placed on an initial application still belongs to that applicant by continually verifying that the number still belongs to the applicant. This will prevent auto-dialing a non-customer. These measures efficiently and meaningfully change the manner by which Capital One conducts its business, and will have tangible benefit to the class and other consumers (Capital One customers and non-customers alike). The objectors arguments are unavailing.

### G.    Cy pres

Certain objectors fault the parties for not identifying a cy pres recipient in the Settlement Agreement. *See* Agreement ¶ 7.04(f). The parties did not do so in order to wait until the end of the claims period to have a better understanding of the potential size of any cy pres fund, so as to better gauge the ideal number and identity of any cy pres recipient. In fact, the Settlement provides for a second distribution of any uncashed checks to remove the need for a cy pres distribution. Regardless, after meeting and conferring, the parties propose that the Court approve the Electronic Frontier Foundation as the cy pres beneficiary, and that the parties post the proposed cy pres beneficiary on the Settlement website. Plaintiffs note that cy pres recipients need not always be identified prior to final approval in this district. *See In re Mexico Money*

---

[23] Pro se objector Mary Smith Tweed's objection regarding the business practice changes makes the same point. In fact, both Ms. Tweed's and Ms. VanWieren's objections share almost an entire paragraph of verbatim, identical argument. *Compare* Dkt. No. 202 at 4 *to* Dkt. No. 227 at 2-3.)

*Transfer Litig.*, 164 F. Supp. 2d at 1031-32 ( (finally approving a settlement that identifies a cy pres fund that is "to be distributed to charitable or public interest organizations that serve Mexican or Mexican-American causes," but not actually naming the recipient).[24]

## IV.     The Two Serial Objectors Lack Credibility.

Class Counsel recognize that objectors can provide genuine assistance to the parties, the Court, and other class members by identifying problems in a proposed settlement.  At times, however, "serial" or "professional" objectors or their counsel file objections solely to advance their own ideological agenda or to extract payments for themselves from the parties or counsel by threatening years of delay associated with unmeritorious settlement objections and appeals:

> Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements.  The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal). Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf the appeal is purportedly raised, gains nothing.

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, *3-4 (D. Mass. Aug. 22, 2006); *see also Vollmer v. Selden,* 350 F.3d 656, 660 (7th Cir. 2003) (improper to file objection to "cause expensive delay in the hope of getting paid to go away").  Accordingly, "when assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first."  *Dennis v. Kellogg Co.,* No. 09-cv-1786-L (WMc), 2013 U.S. Dist. LEXIS 163118, at *11 n.2 (S.D. Cal. Nov. 14, 2013); *In re Law Office of Jonathan E. Fortman, LLC*, No. 4:13MC00042, 2013 U.S. Dist. LEXIS 13903, at *3 (E.D. Mo. Feb. 1, 2013) (same).

---

[24] Collins cites to only Ninth Circuit law for the proposition that a cy pres recipient must be identified.  *See* Dkt. No. 197 at 13.  As noted above, Collins has stated that his "objection is based on Seventh Circuit law."  *See* Dkt. No. 208 at 1 n.1.

Two of the objectors and/or their counsel have widely and repeatedly been criticized as serial, professional, or otherwise vexatious objectors.[25]  The Court should therefore view these objections with skepticism.

### A. Joseph Darrell Palmer is a Serial Objector Found Guilty By the California State Bar of Moral Turpitude for Submitting False Declarations in Support of Prior Objections to Settlements.

Class Member Vanessa FV VanWieren, who submitted an objection to the Settlement, is represented by Joseph Darrell Palmer.  Dkt. No. 202.[26]  The objection fails to notify this Court that the California Bar issued a decision on July 11, 2014 recommending that Mr. Palmer be placed on two years' stayed suspension, two years' probation with conditions, and a ninety day actual suspension for lying about a prior criminal conviction and corresponding discipline by three state bars on three separate applications to appear *pro hac vice* to object to settlements filed in jurisdictions outside of California.[27]  Mr. Palmer is only eligible to practice law because the decision is tolled pending his appeal.[28]

---

[25] In addition, objector Rendee Bullard has not yet appeared with counsel in this action, but has objected in at least one other matter represented by counsel, who is a serial objector.  *See In Re: Checking Account Overdraft Litig.*, MDL No. 2036, Dkt. No. 3048, (S.D. Fla. Nov. 13, 2012).  In that action, Ms. Bullard also objected to the requested attorneys' fees, but withdrew her objection to the settlement on the day of the fairness hearing. *See id.*, Dkt. No. 3099.  Objector Stephen Kron has also objected in another matter involving co-lead counsel Lieff, Cabraser, Heimann & Bernstein, LLP:  a TCPA action against JP Morgan Chase Bank and Federal National Mortgage Association (aka Fannie Mae).  *See generally* 3:10-cv-01284-GPC-BGS (S.D. Cal.).  There, Kron—alongside his wife Cheryl Kron—objected to the settlement for several reasons, including class counsel's fee award. *See id.*, Dkt. No. 125.  Both Cheryl and Stephen Kron are or were represented by their son, Scott Kron.  *See* Dkt.. No. 139-15, Oct. 27, 2014 Depo. Tr. of Stephen Kron.  Cheryl Kron later withdrew her objection. *See id.*, Dkt. No. 133.  During his deposition testimony, Mr. Kron was unable to answer rudimentary questions about his objections and refused to answer questions regarding any possible criminal record. *See id.,* Dkt. No. 139-15; *see also id.,* Dkt. No. 139 at 4-8, Plaintiffs' Opp. to Objections to Class Settlement.   The fairness hearing in the Chase Bank action is set for on December 4, 2014. *See id.*

[26] Mr. Palmer also represents objector Dawn Weaver in the HSBC TCPA action that is before this Court.  *See Wilkins v. HSBC Bank Nev., N.A.*, Case No. 14-cv-190, Dkt. No. 75, (N.D. Ill.).  Mr. Palmer, through Ms. Weaver, raised many of the same objections in that action raised here via Ms. Van Wieren.  (*See generally id.*)

[27] Selbin Decl., Ex. B, *available at* http://members.calbar.ca.gov/courtDocs/12-O-16924-2.pdf.  The California Bar found that, among other things, Mr. Palmer "committed three acts involving moral turpitude in three separate client matters" and, thus, "the magnitude of the misconduct is significant." *Id.* at 11.

[28] *Id.*, Ex. C.

Setting aside his disciplinary problems. Mr. Palmer has a lurid history of making objections solely for the purpose of "selling" appeals, as Mr. Palmer himself has readily admitted. At the 15th Annual National Institute on Class Actions, Mr. Palmer stated while speaking to a room full of lawyers that objecting to class actions is his "hobby" and that he has accepted "a lot" of money to "sell appeals" over the preceding decade.[29] That history is amply demonstrated by numerous instances of vexatious and bad faith litigation and appeals in the class action settlement context, including the following:

- *Arthur v. Sallie Mae*, *Inc.*, No. C10-198JLR (W.D. Wash.): In connection with Mr. Palmer's objection to a TCPA class action settlement, Judge Robart admonished him for his "flat out" false representations to the court and granted the plaintiffs' motion for revocation of Mr. Palmer's *pro hac vice* application. Judge Robart further noted that "many of [Mr. Palmer's] motions since the motion to intervene have been rejected by the court, suggesting that the actions were to disrupt and delay, which is consistent with the fact that Mr. Palmer is a, and I'll use the phrase 'professional' not in any favorable sense, objector."[30]

- *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. 07-md-1827, Dkt. Nos. 7618 & 8759 (N.D. Cal.): Judge Illston held Mr. Palmer in contempt and imposed monetary sanctions for failure to comply with court orders regarding objector discovery.

- *In re Uponor Inc. F1807 Plumbing Fittings*, No.11-2247, Dkt. No. 132 (D. Minn.): Judge Montgomery held "that the Palmer Objectors have evidenced bad faith and vexatious conduct . . . . [T]he Palmer Objectors appear to be represented by an attorney who has not entered an appearance in this case and who is believed to be a serial objector to other class action settlements. This attorney, Darrell Palmer, paid the appellate filing fee on behalf of the Palmer Objectors, and the documents filed on

[29] Selbin Decl., Ex. F at 21:16-22:6; 47:8-9; 59:3-16 & 61:17-21. *See also* Paul Karlsgodt, Notes From the 15th Annual National Institute on Class Actions (Oct. 17, 2011), *available at* http://classactionblawg.com/2011/10/17/notes-from-the-15th-annual-national-institute-on-class-actions/ (last visited on Oct. 14, 2014).

[30] Selbin Decl., Ex. D, Transcript of Motion Hearing, at 16.

their behalf bear his California mailing address rather than the Texas address of the Palmer Objectors . . . . The Palmer Objectors' objections and subsequent appeal appear little more than dilatory tactics of questionable motivation."

- *In re GIB LLC Cases*, J.C.C.P. No. 4657, Dkt. No. 4657 (Super. Ct. Cal. Oct. 22, 2013): An objector who had been represented by Mr. Palmer withdrew her objection after she realized that Mr. Palmer had advanced objections that she did not authorize, agree with, or understand.[31]

*See also In re Oil Spill by Oil Rig Deepwater Horizon*, MDL 2179, 2013 U.S. Dist. LEXIS 4595, at *154 n.40 (E.D. La. Jan. 11, 2013) (noting that "Mr. Palmer has been deemed a 'serial objector'" with a history of "admitt[ed] . . . 'bad faith and vexatious conduct'"); *Heekin*, 2013 U.S. Dist. LEXIS 26700, at *9 (finding "bad faith and vexatious conduct on the part of . . . attorney Darrell Palmer" and noting his reputation as "a serial objector").

Many other courts have admonished Mr. Palmer for making frivolous objections. *See, e.g., Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, Dkt. No. 121 at n.3 (N.D. Cal. July 11, 2014) (In the order finally approving the settlement, the court noted that the objector "is represented by Attorney Darrell Palmer, who courts have 'widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector. . . . [the objector's] objections are similar to boilerplate objections made by Darrell Palmer that have been rejected by other courts.");[32] *In re Dell Sec. Litig.*, No. A-06-CV-726-SS, Dkt. No. 342 (W.D. Tex. Jan. 11, 2011) (describing Mr. Palmer's objection as "absurd" and showing "little respect for the intelligence of this Court."); *City of Roseville Empls. Ret. Sys. v. Orloff*, 484 Fed. Appx. 138, 141 (9th Cir. 2012) (finding Mr. Palmer's appeal of an award of attorneys' fees to be "meritless" and based on misapprehensions of the law); *see also Pappas v. Naked Juice Co.*, No. 11-cv-08276-JAK-PLA, Dkt. No. 184 at 2 (C.D. Cal. Jan. 2, 2014) (overruling an objector respresented by Mr. Palmer

---

[31] Selbin Decl., Ex. E.
[32] Mr. Palmer appealed this order on August 6, 2014. *Id.,* Dkt. No. 124.

finding that she did not "provide substantial evidence to support a finding that the settlement is unfair, inadequate, or unreasonable . . . ."").[33]

Mr. Palmer's demonstrated history of objecting to, and then appealing, class action settlements for his own personal financial gain warrants giving Ms. VanWieren's objection little or no consideration.

**B.     Krystal Nykaza's Counsel John J. Pentz is a Serial Objector.**

Objector Krystal Nykaza's counsel John J. Pentz—who works for the Class Action Fairness Group—has been routinely criticized for his conduct in numerous actions. While Mr. Pentz purports to object to class action settlements on ideological or political grounds, at least one court noted that "Pentz has been 'shameless in his quest to extort settlement fees' from parties to meritorious class settlements." *In re Charles Schwab Corporation Securities Litig.*, No. C 08–01510, 2011 U.S. Dist. LEXIS 18840, at * 9 (N.D. Cal. Feb. 11, 2011) (overruling Mr. Pentz's objection). In that case, the court noted that:

> Class counsel cite at least 33 cases in which Pentz has been an objector or objector counsel, some courts having called Pentz out as a serial objector, and also describe how he 'stalks settlements in which Hagens Berman is class counsel' (Opp. 6—8). . . . This intervention would not be in the best interests of the class but rather would only be in Attorney Pentz's best interest. The class will be much better served by obtaining the class settlement — now — rather than by the scenario Attorney Pentz wants, which is to torpedo the settlement and start anew. Permissive intervention is not warranted.

*Id.* (emphasis added). Pentz's behavior in many cases demonstrates that he acts primarily out of self-interest, and repeatedly makes arguments that are not well-reasoned or helpful to the court or class. *See, e.g., Taubenfeld,* 415 F.3d at 599 (faulting Pentz for failing to articulate his client's argument and putting forth "conclusory allegations" in his client's written objection.); *In re Initial Pub. Offering Secs. Litig.*, 721 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) ("Lending further support to the conclusion that, at least, Pentz[] and [other objectors] are appealing the [Court's

---

[33] In line with his usual conduct of creating delay to extort money from class counsel and the class, Mr. Palmer appealed this order as well. *Id.*, Dkt. No. 193. The appeal was voluntarily dismissed prior to any briefing on April 22, 2014. *Pappas v. Naked Juice Co.*, No. 14-55289, Dkt. No. 11 (9th Cir. Apr. 22, 2014).

final approval order] in bad faith is their outright refusal to comply with this Court's Orders. In connection with plaintiffs' motion, this Court ordered the Objectors' attorneys -- over their objection -- to provide responses to four specific questions. These questions sought to determine if any of the Objectors' counsel have a pattern or practice of objecting to class action settlements for the purpose of securing a settlement from class counsel. . . . Pentz [and other objectors] argued that the requests are 'not proper' and 'did not merit a response.' Such conduct is sanctionable under Rule 37 of the Federal Rules of Civil Procedure. Therefore, an adverse inference may be drawn against . . . Pentz, and [other objectors]. I note, however, that there is sufficient evidence to conclude that . . . Pentz [and other objectors] are represented by serial objectors and that all four Objector groups have engaged in bad faith and vexatious conduct even without drawing a negative inference."); *In re Wal-Mart Wage & Hour Empl. Practices Litig.*, 2:06-CV-00225, 2010 U.S. Dist. LEXIS 21466, at *19 (D. Nev. Mar. 8, 2010) (ordering objector Pentz who appealed the final approval of a class action settlement to post a Rule 7 bond).[34]

Like Mr. Palmer, Mr. Pentz's well-established history of filing meritless and frivolous objections to settlements, acting in bad faith, and generally making arguments of no benefit to the court or class are well-documented. Accordingly, the Court should give Ms. Nykaza's objection little consideration.

---

[34] *See also, e.g.*, *Heekin*, 2013 U.S. Dist. LEXIS 26700, at *10 (Mr. DeJulius [whom Pentz represents] has shown bad faith and vexatious conduct by insisting upon arguments that mischaracterize and misapply Seventh Circuit case law."); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 247 (E.D.N.Y. 2010) (finding Pentz's objections to be without merit); *Simonet v. GlaxoSmithKline*, No. 06-1230 (GAG/CVR), 2009 U.S. Dist. LEXIS 82508, at *9-10 (D.P.R. Sept. 10, 2009) (Pentz's objections are "unfounded" and "result from misunderstanding of the terms of the settlement"); *In re AOL Time Warner ERISA Litig.*, 2007 U.S. Dist. LEXIS 99769, at *10-11 (S.D.N.Y. Nov. 28, 2007) ("[T]he Objection [by Pentz] contained arguments counterproductive to the resolution of the litigation. In this case, the Objection contained several arguments that were irrelevant or simply incorrect. . . . Because these arguments clouded rather than sharpened the issues, Objectors' Counsel are not entitled to compensation for making them. . . ."); *In re Royal Ahold N.V. Securities & Erisa Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006) ("Pentz did not challenge the lodestar figure calculated by plaintiffs' counsel and *provided no coherent explanation for his contention that the fee is excessive. In summary, the Pentz/Tsai objection was not well reasoned and was not helpful*.") (emphasis added).

## V.     __CONCLUSION__

Plaintiffs and Class Counsel respectfully submit that the proposed Class Settlement represents a tremendous outcome for the Class, and none of the objections has merit.  They respectfully request that the objections be overruled, and that the Settlement should be approved as fair, adequate, reasonable, and in the best interests of the Class.


Dated:  November 18, 2014               Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


By:   _/s/  Jonathan D. Selbin_____
        Jonathan D. Selbin

Jonathan D. Selbin
Email:  jselbin@lchb.com
Douglas I. Cuthbertson
Email:  dcuthbertson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

Daniel M. Hutchinson
Email:  dhutchinson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Co-Lead Counsel*

TERRELL MARSHALL DAUDT
 & WILLIE PLLC


By:   /s/ *Beth E. Terrell*
            Beth E. Terrell

Beth E. Terrell
Email:  bterrell@tmdwlaw.com
Michael D. Daudt
Email:  mdaudt@tmdwlaw.com
TERRELL MARSHALL DAUDT & WILLIE PLLC
936 North 34th Street, Suite 400
Seattle, Washington  98103
Telephone:  (206) 816-6603
Facsimile:   (206) 350-3528

*Co-Lead Counsel*


KEOGH LAW, LTD


By:   /s/ *Keith James Keogh*
            Keith James Keogh

Keith James Keogh
Email: Keith@Keoghlaw.com
Craig M. Shapiro
Email: cshapiro@keoghlaw.com
Timothy J. Sostrin
Email: tsostrin@keoghlaw.com
KEOGH LAW, LTD
55 W. Monroe
Suite 3390
Chicago, IL 60603

Telephone:  (312) 726-1092
Facsimile   (312) 726-1093

*Liaison Counsel*

1204670.6