**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE<br>CAPITAL ONE TELEPHONE CONSUMER PROTECTION ACT LITIGATION | Master Docket No. 1:12-cv-10064<br>MDL No. 2416 |
| This document relates to:<br><br>BRIDGETT AMADECK, et al.,<br><br>v.<br><br>CAPITAL ONE FINANCIAL CORPORATION, and CAPITAL ONE BANK (USA), N.A. | Case No. 1:12-cv-10135 |
| This document relates to:<br><br>NICHOLAS MARTIN, et al.,<br><br>v.<br><br>LEADING EDGE RECOVERY SOLUTIONS, LLC, and CAPITAL ONE BANK (USA), N.A. | Case No. 1:11-cv-05886 |
| This document relates to:<br><br>CHARLES C. PATTERSON,<br><br>v.<br><br>CAPITAL MANAGEMENT, L.P., and CAPITAL ONE BANK (USA), N.A. | Case No. 1:12-cv-01061 |
| JEFFREY T. COLLINS,<br><br>    Objector. | |

**OBJECTOR COLLINS' SUPPLEMENTAL BRIEF
IN SUPPORT OF OBJECTION TO ATTORNEYS' FEES**

## INTRODUCTION

Objector Collins sought discovery from class counsel regarding class counsel's lodestar in this case and in previous TCPA cases. *See* Dkts. 191, 191-1. The lodestar information produced by class counsel for this case shows that class counsel is seeking a multiplier of 10.2. *Compare* Motion for Award of Attorneys' Fees and for Service Awards to the Class Representatives ("Fee Request"), Dkt. 176 at 9 (requesting fees of $22,636,529.62) *with* Hutchinson Declaration ("Hutchinson Decl."), Dkt. 252 at 3-6 ($2,213,769 total lodestar). The multiplier would result in a billing rate for the attorneys of up to $7,925/hour, with an average blended rate of $5,303/hour for all timekeepers, be they partners, associates, or support staff. *See* Hutchinson Decl. at 3-6. Indeed, the average rate before the multiplier is $519, *see* Hutchinson Decl., which is nearly the same average rate recently deemed excessive by the Seventh Circuit. *Pearson v. NBTY*, __F.3d__, 2014 U.S. App. LEXIS 21874, *10 (7th Cir. Nov. 19, 2014) ("Even $538 per hour, the average fee allowed by the district judge in cutting the total fees from $4.5 million to $1.93 million, would be excessive.").

A multiplier of over ten is by itself excessive in a case with unexceptional results. But the empirical data—the lodestar information produced for previous TCPA cases—shows that it is also excessive for the level of risk faced by class counsel *ex ante*. The discovery produced demonstrates that, for any given dollar of lodestar invested in TCPA litigation, class counsel has a **64% chance** of obtaining recovery, and that the cases that do settle do so before class counsel has risked a million dollars of lodestar. (While class counsel wins only about half of their TCPA cases, Collins correctly predicted that class counsel invests substantially more lodestar in winning cases than losing cases— nearly three times as much on average.) So long as class counsel obtains a weighted average of 1.57 multiplier of its lodestar in successful cases (one divided by 64%), it will be fully compensated for the contingent risk it faces in TCPA litigation. The 10.2 multiplier here is nearly seven times greater than that 1.57 multiplier needed to compensate class counsel for the *actual* risk assumed in prosecuting this case.

With this supplemental brief, Objector Collins is submitting the expert opinion of Professor M. Todd Henderson ("Henderson Report") who performs an empirical analysis of class counsel's

previous TCPA cases to quantify what market rate *ex ante* would compensate for the risk assumed. In the market-based ex ante world where class counsel is bidding be the for the opportunity to represent a TCPA class of over sixteen million members, the market-based rate for percentage of recovery would be 4.6%, according to Professor Henderson. This is the percentage of recovery that would *ex ante* compensate class counsel in *this case* for the expected risk of obtaining an average recovery litigated with average efficiency in a TCPA litigation of this size. A firm in that *ex ante* marketplace that proposed to a sophisticated consumer of legal services a higher contingent rate would be requesting supercompetitive returns, and would be undercut by other firms in competitive bidding until the rate was no more than 4.6%.

To reach that 4.6% result, Professor Henderson made assumptions generous to class counsel: that class counsel did obtain an average recovery and litigated with average efficiency. If these assumptions are relaxed, the market-based rate is actually less than 4.6%. *First*, the less-than-$5 per capita recovery in this case is less than a penny on the dollar for statutory damages, even if every single class member had only a single TCPA claim. As another district court recently found, even the per-claimant recovery is at the "the lower range of recovery achieved in other TCPA class action settlements." *Rose v. Bank of America*, 2014 U.S. Dist. LEXIS 121641, at *30-*31 (N.D. Cal. Aug. 29, 2014). *Cf. also Murray v GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (questioning tenability of settlement of less than 1% of Fair Credit Reporting Act statutory damages).[1] *Second*, the lodestar in this case is substantially higher than the lodestar in other TCPA cases, and likely reflects inefficient litigation through (a) likely duplicative work performed by *six* different law firms and (b) including time billed to resisting the discovery Collins requested that ultimately exposed the degree to which class counsel is making an excessive fee request and exaggerating the risk it faced.

Note that class counsel's arguments against the Collins' objection are largely red herrings. Collins agrees that that the percentage-of-recovery method is most appropriate; Collins is *not* asking for a cap based on a multiplier of lodestar. Collins merely argues that the *ex ante* contingent percentage

---

[1] Collins is challenging only the fairness of fees in this case under Rule 23(h), not the Rule 23(e) fairness of the settlement.

of recovery in a competitive marketplace will reflect an expectation of recovering a risk-adjusted multiplier of lodestar for successful cases—an approach explicitly endorsed by the Seventh Circuit in explaining how to calculate *ex ante* market-based fees in contingent cases. *Steinlauf v. Continental Illinois Corp.*, 962 F.2d 566, 569 (7th Cir. 1992) (where counsel takes on a case with a 50% chance of success, the appropriate compensation is twice lodestar). When class counsel litigates with above-average results and above-average efficiency, the resulting multiplier will be larger than average. Collins argues here that neither the results nor the efficiency evince above-average performance, and the *ex ante* percentage of recovery should not be expected to return an above-average multiplier in this case. Nothing in Professor Fitzpatrick's or Professor Rosenberg's reports refutes Collins's analysis, because neither considered the empirical data of what return TCPA plaintiffs' attorneys actually receive for their lodestar investment.

**I.       The empirical data shows that an *ex ante* market-based rate would generate no more than a 5% percentage of recovery contingent-fee in a TCPA case with 16 million class members.**

The Seventh Circuit asks for courts to approximate the *ex ante* market-based rate—what a sophisticated client would negotiate before the litigation began. "The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("*Synthroid I*"). An *ex ante* market-based approach imagines the hypothetical "negotiation occurred between lawyers and a sophisticated legal consumer." *Williams v. Rohm & Haas Pension Plan*, 2010 U.S. Dist. LEXIS 54414, at *3-*4 (S.D. Ind. Jun. 1, 2010) (explaining that class is "sophisticated legal consumer" because class counsel is seeking compensation for representing entire class, "not simply for the class representatives"). Collins does not disagree with class counsel that the starting point in a contingent-fee litigation is the percentage of recovery method. But what contingent fee would be negotiated in advance? The higher the risk, the higher the contingent fee percentage necessary to induce class counsel to participate; but the higher the stakes of the case, the lower the percentage necessary to induce class counsel to participate, because of the assurance that even a modest result will produce

substantial compensation. This is consistent with the Seventh Circuit's recognition that the market regularly applies diminishing marginal rates to funds of this size. *In re Synthroid Marketing Litigation*, 325 F.3d 974, 980 (7th Cir. 2003) ("*Synthroid II*").

In *Steinlauf v. Continental Illinois Corp.*, 962 F.2d 566, 569 (7th Cir. 1992), Judge Posner described the effect of risk on an *ex ante* marketplace:

> Suppose a lawyer can get all the work he wants at $200 an hour regardless of the outcome of the case, and he is asked to handle on a contingent basis a case that he estimates he has only a 50 percent chance of winning. Then if (as under the lodestar method) he is still to be paid on an hourly basis, he will charge (if risk neutral) $400 an hour for his work on the case in order that his expected fee will be $200, his normal billing rate. If the fee award is to simulate market compensation, therefore, the lawyer in this example is entitled to a risk multiplier of 2 (2 × $200 = $400).

In our case, class counsel is requesting a 10x multiplier, which would suggest an *ex ante* chance of success of 10%. But we know from the universe of cases that the chance of recovery of a dollar invested in TCPA litigation was 64%. Under *Steinlauf*, the appropriate multiplier—on average—would be 1.57.

In general, we can expect that plaintiffs' counsel in the *ex ante* world would not agree to a contingent fee unless, given the risk of nonpayment and the stakes of the case, the percentage of recovery would, on average, produce an expectation of at least a lodestar amount on average. After all, attorneys can realize lodestar simply by offering hourly billing rates to defendants or other clients who pay in advance. On the other hand, in a competitive *ex ante* marketplace, if one firm requests a contingent percentage of recovery that would produce an *ex ante* expectation greater than lodestar, another firm has the incentive to underbid that firm by offering a lower contingent percentage of recovery that still produces an expectation of lodestar or greater. With enough competition, one would expect the contingent-fee rate to be bid down to the expected risk-adjusted lodestar.

The expert report of Professor M. Todd Henderson uses the methodology dictated by *Steinlauf* to calculate the appropriate *ex ante* percentage of recovery with a competitive market-based rate. Because the risk of TCPA cases is relatively low and because one can expect a TCPA class action with

16 million class members to produce a large settlement on average, Professor Henderson finds that the appropriate *ex ante* market-based rate in this case is below 5% percentage of recovery.

**A.    The empirical data shows that TCPA litigation is both relatively low-risk and lucrative.**

Collins conducted discovery of class counsel's track record in recent TCPA cases; their interrogatory answers are at Henderson Exhibit 5, and summarized in a spreadsheet at Henderson Exhibit 4.[2]

|  | Cases | Hours | Average blended rate | Average lodestar | Total lodestar |
|---|---|---|---|---|---|
| Successful | 16 | 20,132 | $487/hour | $613,333 | $9,813,329 |
| Unsuccessful | 22 | 11,885 | $473/hour | $255,402 | $5,618,837 |

As Collins previously predicted, class counsel devotes considerably more lodestar to successful cases than to unsuccessful cases. As a result, 64% of lodestar investments result in recovery. On average, only a modest multiplier is needed to fully compensate class counsel for the risk. But in the fourteen cases where class counsel has been awarded fees, they have received windfalls:

|  | Cases | Total lodestar | Fees received | Multiplier |
|---|---|---|---|---|
| Successful | 14 | $ 6,889,058 | $17,709,294 | 2.57 |
| Unsuccessful | 22 | $ 5,618,837 | 0 | 0 |
| **Total (concluded cases)** | **36** | **$12,507,894** | **$17,709,294** | **1.42** |
| *Capital One* | 1 | $ 2,213,770 | ?? | ?? |
| *Wilkins v. HSBC*[3] | 1 | $    710,502 | ?? | ?? |

Even including unsuccessful cases where class counsel receives nothing, and omitting two especially lucrative cases where class counsel will receive much more than zero, class counsel has received well over their lodestar. Though class counsel required less than $12.5 million in fee awards to fully compensate them for the risk they undertook (for they will recover at least their lodestar in

---

[2] By order of the magistrate (Dkts. 281, 286), the case names of the results have been redacted and are identified as Cases A through JJ, except for the two pending cases before this Court, *Capital One* and *Wilkins v. HSBC*, where four of the *Capital One* firms are also applying for fees. If the Court would find it helpful to know which letters correspond to which cases, it should order that identification made.

[3] This figure is only for the four firms in *Wilkins v. HSBC* that produced data in this case.

*Capital One* and *Wilkins*, two cases where they are requesting more than ten times their lodestar), courts have, on average, overcompensated class counsel under the Seventh Circuit's *Steinlauf* methodology, and awarded them $17.7 million—not including another several million that class counsel is requesting in a pending motion to reconsider.[4] The $22.6 million fee request in this case and the $12 million fee request in *Wilkins* will only add to the windfall. The lack of competition and the failure of courts to impose *ex ante* market-based rates means that class counsel have, over the last few years, received at the expense of the class, millions more than the Seventh Circuit would entitled them to—an unfairness that class counsel proposes to compound further.

B. **The *ex ante* percentage of recovery will correspond to the risk-adjusted lodestar assuming average success and average efficiency.**

As discussed above, in the *ex ante* market-based world, class counsel will bid down the percentage of recovery such that they would expect to receive lodestar in their total portfolio of cases. As Professor Henderson discusses, we can determine this with a formula:

$$Q * E(R)|S = (1/p) * E(L)|S * e$$

where Q is the contingency percentage, $E(R)|S$ reflects the expected recovery if the case settles, p is the weighted probability that lodestar devoted to the case results in recovery, $E(L)|S$ reflects the expected lodestar devoted to the case to generate a settlement, and $e > 1$ reflects a risk premium to compensate for variance in outcomes and the risk of the winners' curse. Henderson Report at ¶ 65.

We know p is equal to 0.64 from the empirical data produced by class counsel. We don't know for sure what $E(R)|S$ or $E(L)|S$ is. But we can make a simplifying assumption: if we assume that class counsel litigated *this* case with average success and average efficiency, we can plug in the actual settlement value of $75.5 million and the actual lodestar of $2.2 million into the formula. When all that math is done, Q = 4.6%.[5] If multiple firms competed for this litigation *ex ante*, and one opened competitive bidding with an offer to take the case at a 30% contingent recovery, other firms would recognize the opportunity for a windfall, and systematically offer to do the case for less to win the

---

[4] Collins will identify this case upon the Court's request.

[5] Professor Henderson calculated this Q based on a settlement value of $75.5 million. If one uses a settlement value of $70.8 million, as *Pearson* requires, Q equals just under 5%.

rights to a windfall until the excess rents were competed away and the sophisticated purchaser of legal services was able to negotiate a 4.6% contingency fee. *Id.* ¶¶ 78-80, 90.

Note that these simplifying assumptions are ***generous*** to class counsel in this case. While a $75.5 million settlement is large, it reflects the fact that this ***class*** is large, 16.4 million members. The *per capita* value per class member is worth less than $5, or less than 1% of statutory damages for a single TCPA claim. Even the recovery per claimant, estimated at $35-$37, is less than half of the same ratio in *Wilkins*; one court called a $20-$40 recovery as falling in "the lower range of recovery achieved in other TCPA class action settlements." *Rose v. Bank of America*, 2014 U.S. Dist. LEXIS 121641, at *30-*31 (N.D. Cal. Aug. 29, 2014). This is a below-average nuisance settlement.

Too, there is no reason to think that this case was litigated with above-average efficiency. *First*, the lodestar is substantially higher than in other TCPA settlements; even the blended rate is higher, at $519/hour versus the $482/hour for typical TCPA litigation (and not much below the $538/hour figure criticized in *Pearson v. NBTY, Inc.*, 2014 U.S. App. LEXIS 21874 at *10, as top-heavy). *Second*, with six law firms participating in this case, there was almost certainly duplication of effort. *Third*, on information and belief, the $2.2 million lodestar figure is inflated to include multiple rounds of briefing and hearings by class counsel resisting the discovery Collins sought. It would not be surprising if class counsel churned hundreds of thousands of dollars of lodestar on fighting the objections to their supersized fee (hoping, if nothing else, to have a less embarrassing multiplier to defend), and now seeks to count those self-serving expenditures towards their lodestar. This Court should *sua sponte* request clarification *when* class counsel generated that $2.2 million in lodestar.

If this Court believes this case produced below-average results or was litigated with below-average efficiency, then the Henderson model prediction of a 4.6% *ex ante* market-based fee ***overstates*** the appropriate award to class counsel. (Conversely, if this case was litigated with above-average results or above-average efficiency, then the 4.6% figure understates the *ex ante* market-based fee.)

Note that the Henderson model does ***not*** argue for a cap on the multiplier or that a 30% fee is never appropriate. If this was a much smaller class that required an expected $800,000 lodestar

investment to produce an average $4 million settlement, the model might well produce an *ex ante* rate of 30%. For another example, if this had been an unusually successful settlement that won $100/class member instead of under $5/class member, the Henderson model would produce an even higher multiplier than class counsel requests here. Nor is the model a *per se* argument for a megafund cap, as opposed to contextual consideration of the stakes of the case. For example, if the class was 160,000 members, rather than 16 million members, and class counsel produced a $75.5 million settlement, a 30% award might well be appropriate *ex ante*. But in this case, with a gigantic class, if class counsel's results and efficiency are average, *ex ante* market analysis means they are not entitled to more than 4.6% of the gross fund (which works out to about the 5% of the net fund after settlement administration expenses.)

**C.   Professor Fitzpatrick's opinion that 30% is appropriate ignores Seventh Circuit law, the empirical data produced by class counsel, and his own peer-reviewed research.**

Professor Fitzpatrick argues that 30% is the appropriate *ex ante* figure because that's what other courts award, but most other courts do not perform the Seventh Circuit's *ex ante* market-based test (and none have ever used the analysis proposed by the Seventh Circuit in *Steinlauf*). His analysis does not consider the relatively low investment required to litigate a TCPA case, the specific stakes involved in this case that guaranteed that even a modest nuisance settlement would produce tens of millions of dollars of recovery, or the fact that class counsel **on average** receives $700/hour for TCPA litigation (including unsuccessful cases) and is requesting over $5000/hour here. Professor Fitzpatrick's analysis simply isn't credible, and is affected by several false premises. For example, Professor Fitzpatrick argues that the amount the class receives is not relevant. Ftizpatrick Report at ¶ 13. The Seventh Circuit disagrees, repeatedly just this year, in *Pearson*; *Redman v. Redman v. RadioShack Corp.*; and *Eubank v. Pella*. Of course class members would prefer a direct check for their statutory damages of $1500 (or $3000 or $4500 or more, depending on how many phone calls they received) to making a claim for an amount between $20 and $40.

Professor Fitzpatrick has no explanation why an average rate of $5,294 (an *ex post* multiplier of lodestar of 10.2) is needed *ex ante* to induce counsel to bring these cases; there is no evidence he even considered these returns in reaching his conclusions. Professor Fitzpatrick's arguments that the

TCPA is designed to induce law suits for deterrence purposes (because class members have suffered "virtually no damages") is therefore a non sequitur that does not support his conclusion that a 30% percentage of recovery for a nuisance settlement is needed to induce class counsel to litigate for such nuisance settlements in the first place. Fitzpatrick Decl. at 11. The failure in reasoning demonstrates a flaw of the percentage-of-recovery approach when used without accounting for the stakes of the case: mechanically applying a 30% return, as Professor Fitzpatrick does, **reduces** deterrence, because it incentivizes attorneys to sue defendants because they are big, rather than because they have engaged in wrongdoing.[6]

Professor Fitzpatrick's deterrence-based class-members-don't-matter approach would hold that it is appropriate to pay the attorneys 100% of the fund—and indeed, he has taken that position in his writings. *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2047 (2010). It is little wonder that he is willing to endorse a 30% contingency fee that pays the attorneys over $5000/hour—despite the fact that his own empirical work shows that a 19% contingency fee is more typical in a settlement of this magnitude. *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 839 (2010). That Professor Fitzpatrick tells this Court different things than he tells a peer-reviewed journal suggests exclusion under *Daubert*—but so does his failure to consider the actual data in this case.[7]

While 4.6% is substantially less than the 30% awarded in smaller cases, it is not appreciably smaller than in cases with **actual** ex ante market-based competition. For example, antitrust cases both require far more work and involve far more risk than TCPA cases, but when one such case was put

---

[6] Similarly, Professor Fitzpatrick's assumption that a payment of less than 1% of statutory damages reflects defendants' guilt and a need for additional deterrence, rather than a nuisance settlement, beggars reality. If defendants have violated the law, then the problem with the settlement is less that the attorneys are being paid too much, but that the class is being sold out at a price far cheaper than Congress imposed for statutory violations. *Murray v. GMAC Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). Collins is not challenging the size of the settlement, however, as opposed to the request for an above-*ex-ante*-market attorney fee.

[7] Moreover, neither the David Rosenberg Declaration nor the report of Brian T. Fitzpatrick, also submitted with plaintiffs' briefing, discuss their compensation for preparation of their reports as required by Fed. Rule Civ. Proc. 26(2)(B)(vi). *See* Rosenberg Decl., Dkt. 271; Declaration of Brian T. Fitzpatrick ("Fitpatrick Decl."), Dkt. 270.

out for bid, high-quality counsel are willing to work on them for an almost identical 4.7% percent of recovery. *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 84 (S.D.N.Y. 2000) (awarding lead-counsel status to Boies, Schiller & Flexner LLP); 2001 WL 170792 at *1 (Feb. 22, 2001) (revealing counsel's fee as 4.7% of total recovery). They are even willing to negotiate a hard cap that prevents their fees from rising over 14% of the recovery and allowing the class to recover 100% of any recovery over a set amount. *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190, 1198 (N.D. Ill. 1996) (sliding-scale recovery at capped $3.5 million with no additional fees for recovery over $25 million). The 4.6% is also similar to a 7.5% percent of recovery awarded in a $32 million TCPA settlement in *Rose v. Bank of America.* 2014 U.S. Dist. LEXIS 121641, at *37. For this reason, courts in the Seventh Circuit should follow *Synthroid*'s advice and demand **actual** *ex ante* setting of class counsel rates (264 F.3d at 718-19) to prevent the sort of *ex post* opportunism seen here.[8]

\* \* \*

This Court should adopt the Henderson model and set the percentage of recovery accordingly: 4.6% if it believes the case was litigated with average success and efficiency (thus producing a 1.57 multiplier), with a sliding scale lower or higher otherwise. No sophisticated purchaser of legal services would *ex ante* agree to a fee that would produce such gigantic payments of thousands of dollars an hour for such paltry results, notwithstanding Professor Fitzpatrick's *ipse dixit*.

---

[8] The Seventh Circuit in *Synthroid II* rejected the idea that an auction is required to generate market efficiencies in counsel selection. But Rule 23 contemplates such a competition with the appointment of class counsel. *See* Fed. R. Civ. Proc. 23(g)(2) ("If more than one adequate applicant seeks appointment, the court must appoint **the applicant** best able to represent the interests of the class.") (emphasis added). Since *Synthroid II*, the Seventh Circuit in *Pearson* indicated its interest in revisiting earlier class-action settlement jurisprudence that failed to fully scrutinize the inherent conflicts of interest between class counsel and the class. In this case, competitive bidding would likely have improved efficiency. For example, in this case, because there was limited confirmatory discovery and the bulk of the docket was devoted to settlement negotiations, it is likely that there was much duplication in the work performed by the six firms: lodestar totaling $605k, $380k, $417k, $221k, $337k, $254k. *See* Hutchinson Decl. Dkt. 252 at 3-6. Competitive bidding or an auction would have improved efficiency and produced a market-based rate. Collins reserves the right to ask the Seventh Circuit to revisit *Synthroid II* and hold that auctions or other competitive *ex ante* counsel selection are required, while recognizing that this Court is bound to hold otherwise.

**II.     In the alternative, a straightforward lodestar crosscheck analysis demonstrates that the fee request would produce a windfall recovery to class counsel relative to the low level of success in this settlement.**

"A proper attorneys' fee award is based on success obtained *and* expense (including opportunity cost of time) incurred." *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687 (7th Cir. 2008) ("*Mirfasihi III*"). Lodestar cross-check is valuable in the Seventh Circuit *ex ante* market approach because "any law firm engaged in such *ex ante* negotiations would attempt to estimate the opportunity costs of the engagement by calculating the number of hours likely required for a particular litigation compared to some other investment of their time and efforts." *Williams*, 2010 U.S. Dist. LEXIS 54414, at *2, *4-*5 (citing *In re Trans Union Corp. Privacy Litig.*, 2009 U.S. Dist. LEXIS 116934, *16-*17 (N.D. Ill. Dec. 9, 2009) (utilizing lodestar data for purposes of cross-check)). In awarding fees, courts utilize the lodestar crosscheck to "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate." In re *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 945 (9th Cir. 2011); *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001) ("The goal of [the lodestar cross check] is to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel.").

The Seventh Circuit itself has suggested that a lodestar multiplier of two might be a "sensible ceiling" to avoid unwarranted attorney windfalls. *Skelton v. Gen. Motors Corp.*, 860 F. 2d 250, 258 (7th Cir. 1988); *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) (citing *Skelton* approvingly); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (same). As the Seventh Circuit recently noted, "attorneys' fees don't ride an escalator called risk into the financial stratosphere." *Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014). Class counsel's request is 5 times greater than the Seventh Circuit's "sensible ceiling." But even a multiplier of two would be excessive here.

While a multiplier of two may be appropriate in a case with extraordinary risk and results, this was a nuisance settlement where class counsel had a greater than even chance of recovering its fees. There is a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee

would not have been adequate to attract competent counsel." *Id.* at 1673.[9] "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant." *Id.* Here, there was no trouble attracting counsel as there are *six firms* serving as class counsel who achieved unremarkable results. This lawsuit alleges that over 16 million class members are entitled to $500 to $1500 damages per violation. *See* Amended Consolidated Master Class Action Complaint, Dkt. 120 at 13-14; Plaintiffs' Memo in Support of Final Approval, Dkt. 262 at 19. After administrative costs, there is $70.8 million relief available to the class. *See* Jonathan D. Selbin Declaration, Dkt. 177 ¶ 30 ($4,628,700 administrative costs). The relief would provide an average of less than $3-$4 per class member, less than 1% of their damages—a nuisance settlement. *Cf. Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006) ("And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout."). Class counsel's lodestar here (without a multiplier) results in a $519 average rate. *See* Hutchinson Decl., Dkt. 252 at 3-6. It is unlikely that the market-based billing rate for settlement of a nuisance suit would be $519.

This approach, within this Court's discretion, militates for an award in the $2-$3 million range.

### III. Class counsel's failure to disclose the allocation of the requested fee violates Rule 23(h) and results in hidden windfall.

The six firms here have reached a secret, undisclosed agreement to split fees, which is not just antithetical to a market-based approach, but smacks of illegal price fixing. *Cf.* Joseph Ostoyich and William Lavery, *Looks Like Price-Fixing Among Class Action Plaintiffs Firms,* Law360 (May 28, 2014). Class counsel's motion and the Settlement Agreement do not identify how the attorney fee award will be allocated among the different firms serving as class counsel. *See* Fee Request, Dkt. 176; Motion for

---

[9] *Perdue*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but several courts hold it has equal application to "reasonable" fee awards in class actions made under Fed. R. Civ. P. 23(h). *See, e.g., Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496, 500 (6th Cir. 2011); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011); *cf. also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J. concurring/dissenting) (referring to *Perdue* as an "analogous statutory fee-shifting case.").

Attorneys' Fees, Dkt. 175; Settlement Agreement ¶ 5.01. Failure to identify how the fee award will be allocated is a violation of Rule 23(h). *See In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) (noting the district court's "independent duty … to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel" which duty cannot be delegated to the parties); *cf. In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010).

The failure to identify how the fee award will be split up presents another problem regarding hidden windfall in fee awards. Based on class counsel's discovery production, fee awards are not always allocated pro rata based on the amount of lodestar incurred or hours devoted to the case. For example, in Case B, Meyer Wilson Co. LPA incurred lodestar of $307,298 and Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") incurred lodestar of $1.5 million. *See* Class Counsel Discovery Responses (attached at Exhibit 5 to Henderson Report). Even though Lieff Cabraser incurred three times the lodestar Meyer Wilson did, they both received the same amount of fees of $1.9 million. *See id.* Based on their allocation agreement, Lieff received a multiplier of 1.28 and Meyer Wilson received a multiplier of 6.4. Without disclosure of allocation agreements, a potential enormous windfall achieved by one firm will remain hidden. The firms should be required to disclose such agreements and explain why any windfall should not be returned to the class. The firms should be required to disclose such agreements and explain why any windfall should not be returned to the class. *See* Fed. R. Civ. P. 23(e)(3) (requiring disclosure of secret side agreements).

## IV. *Pearson* does not help class counsel's case.

Class counsel argues that *Pearson v. NBTY, Inc.*, supports their 30% fee request of a megafund. Dkt. 278. This is a misreading of the case. The *Pearson* ratio is meant to provide a *cap* on the fee structure of a settlement as a sign of whether a settlement is unfairly self-dealing. *Pearson* does not create a floor on fees, nor does it hold that a lower percentage of recovery is never appropriate. Again, Collins is not challenging Rule 23(e) fairness, just the Rule 23(h) fee request.

What *Pearson* does demonstrate is that the parties' attempt to ignore the *Redman v. RadioShack* exclusion of administrative expenses from the calculation (Dkt. 176 at 10-11) is incorrect: the *Redman* rule was reaffirmed in *Pearson*, and shows that administrative expenses are to be disregarded as a class

benefit in all settlements, not just the abusive coupon settlement in *Redman*. *Pearson*, 2014 U.S. App. LEXIS 21874 at *8.

## CONCLUSION

The Court should adopt the Henderson Report and scale the Rule 23(h) award to reflect an appropriate market rate for fees that utilizes a multiplier consistent with class counsel's quantified risk and the Court should require disclosure of the division of the fee award consistent with Rule 23(h).

Dated: December 5, 2014.    /s/ Melissa A. Holyoak
                                                  Melissa A. Holyoak, (DC Bar No. 487759)
                                                Center for Class Action Fairness
                                                1718 M Street NW, No. 236
                                                Washington, DC 20036
                                                Phone: (573) 823-5377
                                                Email: melissaholyoak@gmail.com

                                                *Attorney for Objector Jeffrey T. Collins*

### Certificate of Service

      The undersigned certifies she electronically filed the foregoing Collins' Supplemental Brief and Report of M. Todd Henderson via the ECF system for the Northern District of Illinois, thus effecting service on all attorneys registered for electronic filing. Additionally she caused to be served via first class mail a copy of this Supplemental Brief and Report of M. Todd Henderson upon the following:

| | |
|---|---|
| Andre Verdun<br>Crowley Law Group<br>401 West "A" Street, Suite 925<br>San Diego, CA 92101 | Jeanne Lahiff<br>Sleemi Law Firm<br>2001 Route 46<br>Suite 310<br>Parsippany, NJ 07054 |
| Chelsea Hamill<br>Doll Amir and Eley LLP<br>1888 Century Park East , Suite 1850<br>Los Angeles, CA 90067 | Kenneth Grace<br>Sessions Fishman Nathan & Israel LLC<br>3350 Buschwood Park Drive, Ste 195<br>Tampa, FL 33618-4317 |
| Christy T. Nash<br>Burr & Forman LLP<br>Suite 3200<br>201 N. Franklin St.<br>Tampa, FL 33602 | Marjorie Bergiste<br>10352 Old Winston Ct<br>Lake Worth, FL 33449 |
| Darren Sharp<br>Armstrong Teasdale LLP<br>2345 Grand<br>Suite 2000<br>Kansas City, MO 64108 | Mitchell B. Levine<br>Fishman McIntyre P.C.<br>12th Floor<br>44 Wall Street<br>New York, NY 10005 |
| George C Bedell<br>Lash & Wilcox, PL<br>4401 W. Kennedy Blvd., Suite 210<br>Tampa, FL 33609 | Sarah Nicole Davis<br>Morrison & Foerster<br>425 Market St<br>SF, CA 94105 |
| | Devera R.D. Bartte<br>3440 SW 28th Terrace<br>Apt A<br>Gainesville FL 32608 |

Additionally, she caused to be mailed a courtesy copy of the foregoing via overnight courier to:

Hon. James F. Holderman
United States District Court for the Northern District of Illinois
Everett McKinley Dirksen United States Courthouse
Room 2516A
219 South Dearborn Street
Chicago, IL 60604

Dated: December 5, 2014.                 <u>/s/ Melissa A. Holyoak</u>

---